COMAIR, INC.; and Comair Services, Inc., Appellants,

v.

LEXINGTON–FAYETTE URBAN COUNTY AIRPORT CORPORATION; and Lexington–Fayette Urban County Airport Board, and the Members, Officers and Directors of the Board and/or Corporation in their Official Capacities, Appellees.

No. 2007–SC–000602–TG.

Supreme Court of Kentucky.

Oct. 1, 2009.

Ronald L. Green, Boehl, Stopher & Graves, LLP, Lexington, KY, Raymond G. Smith, Edward H. Stopher, Jeffrey Wayne Adamson, Boehl, Stopher & Graves, LLP, Louisville, KY, for appellants.

Kevin G. Henry, Sturgill, Turner, Barker & Moloney, PLLC, Lexington, KY, for appellees.

Opinion of the Court by Justice NOBLE.

This case raises the question whether the Lexington–Fayette Urban County Air-

port Board, the Lexington–Fayette Urban County Airport Corporations, and the Board's members are entitled to sovereign, governmental, or other immunity so as to preclude liability in litigation over a tragic air crash. The Fayette Circuit Court found they are immune. Because the Airport Board and Airport Corporation are government agencies, specifically of the Lexington–Fayette Urban County Government, performing a governmental function, they are entitled to immunity from suit for alleged negligence, and the board members are entitled to immunity from suit in their representative capacities. The circuit court therefore is affirmed.

## I. Background

Comair Flight 5191 was scheduled to depart from Lexington Blue Grass Airport at approximately 6:00 a.m. on August 27, 2006. Due to ongoing redesign and reconstruction of the runways and taxiways, the normal path to the regular runway was reportedly blocked. In attempting to navigate the construction, the plane took a wrong turn and ended up on a shorter secondary runway from which it could not gain sufficient altitude for a safe takeoff and crashed into an adjacent field immediately after takeoff. All forty-seven passengers and two crew members died. A third crew member was critically injured but survived the crash.

The estates of the deceased passengers began filing wrongful death actions against the companies that operated Flight 5191, Comair, Inc. and Comair Services, Inc. (collectively "Comair"), in the Fayette Circuit Court on September 1, 2006. Eventu-

ally forty-four such suits were filed. Other claims were filed in federal district court,[1] and at least one was filed in Florida state court.

In May 2007, Comair filed a third-party complaint naming the Lexington–Fayette Urban County Airport Board, the Lexington–Fayette Urban County Airport Corporation, and twenty John Does (the members of the Board) in their individual and representative capacities. Initial discovery was undertaken, including the production of financial records and the deposition of John Rhodes, the Blue Grass Airport Director of Administration and Finance. In June, the Airport Board and the Airport Corporation moved to dismiss the third-party complaint on the ground that they enjoyed immunity from liability.

On August 2, 2007, the circuit court held a hearing on the motion to dismiss. At the hearing, the court orally discussed the Kentucky cases covering immunity of government agencies, stating that the matter would ordinarily be controlled by *Kentucky Center for the Arts v. Berns*, 801 S.W.2d 327 (Ky.1990), but noting that the Court of Appeals had previously held that the Airport Board and Airport Corporation were entitled to immunity in *Inco, Ltd. v. Lexington–Fayette Urban County Airport Board*, 705 S.W.2d 933 (Ky.App.1985). Finding that *Inco, Ltd.* was binding precedent, the circuit court dismissed as to the Airport Board, the Airport Corporation, and the Board members.[2] In a subsequent written order, the circuit court "adopt[ed] by reference its oral bench rul-

---

**1.** The federal litigation, which has actually moved between the state and federal courts several times, has been described in some detail by the federal district court in *In re Air Crash at Lexington, Kentucky, August 27, 2006,* No. 5:06–cv–316–KSF, 2007 WL 4206687 (E.D.Ky. Nov.26 2007) (unpublished).

**2.** The court's dismissal order did not distinguish between suit against the board members in their individual and official capacities.

ing stating its rationale" from the August 2nd hearing.

Comair appealed the decision. Given the importance of the issues, this Court transferred the case from the Court of Appeals' docket to its own.

## II. Analysis

Comair has challenged the trial court's decision as to the immunity of the Airport Board, the Airport Corporation, and the Board's members in their official capacities, but has not addressed the board members' immunity or liability in their individual capacities. This Court will therefore not address individual liability issues.

Despite the frequency of opinions on the subject from this Court, the law of sovereign immunity, and the related doctrines of governmental immunity, official immunity, and qualified official immunity, is still difficult to apply, no doubt in part because of the large number of decisions on the subject. Attitudes about the propriety of immunity for the state and its subdivisions, government agencies and their employees, and government-created entities have shifted back and forth over time and personnel changes on the Court.

The one clear thing is that pure sovereign immunity, for the state itself, has long been the rule in Kentucky. Though "[t]he basis and policy of the doctrine has been many times stated," *Kentucky State Park Com'n v. Wilder*, 260 Ky. 190, 84 S.W.2d 38, 39 (1935)—as has much criticism—perhaps the most succinct explanation accounting for the concept is that "it is not a tort for government to govern...." *Dalehite v. United States*, 346 U.S. 15, 57, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) (Jackson,

J., dissenting). In Kentucky the doctrine is sometimes claimed to stem from Section 231 of the Kentucky Constitution, but it is really a common law concept that recognizes a quality (immunity from suit) of the sovereign state: "Absolute immunity from suit is a high attribute and prerogative of sovereignty.... This immunity has come down to us as a part of the fundamental common law and is only indirectly contained in the Constitution." *Wilder*, 84 S.W.2d at 39.[3] Put more succinctly: "The immunity as a matter of fact appears in the Constitution not at all, except as the grant of a dispensing power of the legislature implies the existence of the immunity." Paul Oberst, *The Board of Claims Act of 1950*, 39 Ky. L.J. 35, 35 n. 8 (1950–1951). More recently, the doctrine has been "recognized as an inherent attribute of the state" in *Yanero v. Davis*, 65 S.W.3d 510, 523 (Ky.2001).

■ The reach of sovereign immunity becomes more complicated when dealing with governmental and quasi-governmental entities and departments below the level of the Commonwealth itself. However, at least one line is clear for now: the distinction between counties and cities. Counties, which predate the existence of the state and are considered direct political subdivisions of it, enjoy the same immunity as the state itself. *Lexington–Fayette Urban County Government v. Smolcic*, 142 S.W.3d 128, 132 (Ky.2004); *see also Schwindel v. Meade County*, 113 S.W.3d 159, 163 (Ky.2003) ("A county government is cloaked with sovereign immunity."); *cf.* Thomas P. Lewis, James S. Kotas, and Charles N. Carnes, *Consolidation—Complete or Functional—of City and County Governments in Kentucky*, 42 Ky. L.J. 295 (1952–1953) ("[T]he main pur-

**3.** The closest the Constitution comes to directly expressing sovereign immunity is in Section 230, which bars the taking of money from the treasury except by appropriations by the legislature.

pose of counties has been to function as administrative subdivisions of the state."). Cities, as municipal corporations, on the other hand, while enjoying some immunity for much of this state's history, are now liable for negligent acts outside the legislative and judicial realms. *See Gas Service Co., Inc. v. City of London,* 687 S.W.2d 144, 146 (Ky.1985); *Haney v. City of Lexington,* 386 S.W.2d 738, 742 (Ky. 1964).

Numerous other entities, however, fall outside this taxonomy of city versus state and county, and it is not immediately clear whether they are agencies of the state, and therefore possibly entitled to immunity, or more akin to municipal corporations, and are therefore liable in tort. These in-between entities have given courts the most trouble in recent years.

The obvious starting point for addressing the immune status of the entities in this case is the previous case law related to them. Airport boards (frequently termed "air boards") have been discussed numerous times by this Court, then sitting as the Court of Appeals, and the current intermediate Court of Appeals. Usually, however, the immune status of such entities has not been the primary concern in the case. Nevertheless, those cases demonstrate the confusion surrounding the exact legal nature of airport boards.

When this Court sat as the Court of Appeals prior to the current Judicial Article, several decisions addressed county airport boards and described them as municipal corporations or similar entities. *See, e.g., Dixie Taxi Service, Inc. v. Louisville and Jefferson County Air Bd.,* 465 S.W.2d 273, 274–76 (Ky.1971) (analogizing the air board to a private property owner); *Bowling Green–Warren County Airport Bd. v. Bridges Aircraft Sales & Service, Inc.,* 460

S.W.2d 18, 19 (Ky.1970) ("The [Airport] Board is a municipal corporation established pursuant to the enablements of KRS 183.133."); *Sawyer v. Jefferson County Fiscal Court,* 438 S.W.2d 531, 534 (Ky. 1969) (citing *Louisville & Jefferson County Air Board v. American Airlines, Inc.,* 160 F.Supp. 771 (W.D.Ky.1958), as having held that an airport board is a municipal corporation: "[t]here is nothing extraordinary in the concept that a [development board created by the fiscal court] is a municipality"); *Stephenson v. Louisville and Jefferson County Bd. of Health,* 389 S.W.2d 637, 638 (Ky.1965) (stating in dicta that the Louisville and Jefferson County Air Board was a "municipal corporation" based a *Louisville & Jefferson County Air Board v. American Airlines, Inc.,* 160 F.Supp. 771 (W.D.Ky.1958), and holding that the Board of Health, also a municipal corporation, was not immune under *Haney v. City of Lexington* ); *Louisville and Jefferson County Air Bd. v. Porter,* 397 S.W.2d 146, 150 (Ky.1965) (stating in dicta that an airport board is "a governmental agency which has the power to sue and be sued liable for damage to property caused by its non-negligent acts," in the context of a nuisance/reverse-condemnation claim).

If airport boards are to be viewed as municipal corporations as the cases above say, then under *Haney* they are not entitled to immunity. However, none of these old Court of Appeals cases expressly addressed immunity in tort for airport boards, and many did not turn on immunity issues at all, and may have used the term "municipal corporation" more as a way to identify an entity.

The only case to directly address the immune status of an airport board is *Inco, Ltd. v. Lexington–Fayette Urban County Airport Board,* 705 S.W.2d 933 (Ky.App.

1985).[4] Our current Court of Appeals addressed the question of "whether the airport board is a separate entity from the county, and if so, is it denied the immunity enjoyed by the government?" *Id.* at 934. The court held that the Airport Board was a county agency either at its inception, if it was created by Fayette County, or upon the merger of the city of Lexington and Fayette County to form the Lexington–Fayette Urban County Government, which had the effect of "extend[ing] the immunity of the state and the county to the air board." *Id.* Though this Court did not grant discretionary review of that decision, it is important to note that the Court of Appeals opinion was ordered to be published.

However, that decision contained a separate opinion concurring in result only, written by Judge Wilhoit which presages the question that is presented in this case as to whether separate corporate entities can be governmental (state agencies) and thus immune: "I cannot agree with the majority opinion insofar as it holds that the Lexington–Fayette Urban County Airport Board is a unit of the urban county government." *Id.* at 935. He cited to KRS 183.132(2) (now 183.132(3)), which stated that an air board is "a body politic and corporate with the usual corporate attributes," which he viewed as showing that "the board is plainly not a unit of the urban county government, but an independent entity which performs designated governmental functions including limited legislative functions." 705 S.W.2d at 935. He concluded "that under our case law such an entity constitutes a quasi-municipal corporation." *Id.* (citing *Fawbush v. Louisville & Jefferson County Metropolitan Sewer Dist.,* 240 S.W.2d 622 (Ky. 1951)). He then framed the relevant inquiry as "whether a quasi-municipal corporation possesses only the limited immunity from tort claims of a true municipality or whether it shares the sovereign immunity of the State." *Id.* (citation omitted). He concluded that "[i]t is far from clear to me how our Supreme Court would answer that question today; however, in the past it has recognized a distinction between 'municipal corporations proper' and 'quasi-municipal corporations.' It has treated the latter as state agencies for the purpose of liability for negligence." *Id.* Thus, while he did so for different reasons, he agreed that the Airport Board was entitled to immunity.

While Judge Wilhoit focused on "quasi-municipal corporations," a now nearly defunct legal term in sovereign immunity issues,[5] he did pose the problem that con-

---

4. This Court has one other time addressed the issue, although in an oblique way, in *Bernard v. Russell County Air Board,* 718 S.W.2d 123 (Ky.1986), which involved a dispute over whether the air board could condemn property for the airport independent of the Russell County government. The Court noted that because its eminent domain power was not an independent power and had to be exercised through the county government, "[t]he Russell County Air Board is not a wholly independent board," *id.* at 125, and that it "is subordinate to the Russell County government," *id.* at 126. The Court concluded,

> A board comprised of six individuals should not have the power independent of the Russell County government, to take property

away from private citizens. Respondent argues that airport boards are not departments of county government, yet claims the Russell County Air Board was appointed by the county judge-executive and is funded and authorized by the county. The board's attachment to the Russell County government indicates the board should be held responsible to the county government.

*Id.*

5. Judge Wilhoit relied on *Fawbush v. Louisville & Jefferson County Metropolitan Sewer District,* 240 S.W.2d 622 (Ky.1951), and *Board of Education of Louisville v. Society of Alumni of Louisville Male High School,* 239 S.W.2d 931 (Ky.1951), for his discussion of "quasi-municipal corporations." This Court's

tinues to plague the courts: what makes one corporate entity municipal and thus not immune, and another a state agency that is immune? This is the question that this Court attempted to answer in 1991 in *Kentucky Center for the Arts v. Berns*, 801 S.W.2d 327 (Ky.1990). It is also one of the questions that must be answered to determine whether the LFUC Airport Board and the Airport Corporation continue to be entitled to the sovereign immunity they have enjoyed since *Inco, Ltd.*

The modern "basic" test for whether an entity is entitled to sovereign immunity was laid out in *Berns*, where the Court addressed "when the sovereign immunity defense applies to an entity created by an act of the General Assembly . . . ." *Id.* at 328. The entity in question was the Kentucky Center for the Arts in Louisville, which was created by statute. *See* KRS 153.400–.460. In analyzing the situation, however, the Court did not appear to have a single coherent rule.

At first it noted that the Center for the Arts "was not created to discharge any 'governmental function' in the context in which § 231 of the Constitution was written," *id.* at 330, and that it "performs substantially the same functions as any private business engaged in the entertainment business," *id.* at 331. Based on these observations, the Court then noted,

[C]ertainly not every business can be immunized simply because it is established by act of the General Assembly . . . . We cannot perceive how a patron attending the Louisville Orchestra, which formerly performed at the Macauley Theatre and now performs at the Kentucky Center for the Arts, has been deprived by reason of the change in location of his right to maintain a common law action when he is negligently injured. The corporation furnishing the performance hall now is performing the same function that the corporation operating the Macauley Theatre did in the past. If we were to follow such reasoning, there would be no limitation on the scope of sovereign immunity. Every time the state gets involved in an enterprise formerly private the area of sovereign immunity would expand accordingly.

*Id.* This discussion alone would have been sufficient to find that the Center for the Arts lacked immunity.

Rather than standing on this conclusion, however, the Court went on to address an earlier case, *Gnau v. Louisville & Jefferson County Metropolitan Sewer District*, 346 S.W.2d 754 (Ky.1961), in which the former Court of Appeals had addressed whether the Metropolitan Sewer District was an "agency of the state" under the Board of Claims Act. From that case, it gleaned a "two-pronged test, the first consisting of the 'direction and control of the central State government,' and the second consisting of being 'supported by monies which are disbursed by authority of the Commissioner of Finance out of the State treasury.' " *Id.* Under this test, the Court concluded, "our constitutional fathers would not view this activity as qualifying for sovereign immunity." *Id.*

Despite laying out this "test" for sovereign immunity, the Court in *Berns* still continued its discussion, turning this time to municipal corporations, which are not entitled to sovereign immunity under *Haney* and *Gas Service Co., Inc.* The Court noted that the term "municipal corporation" (1) refers to "local entities created by act of the General Assembly and not agencies performing the services of central

research shows that by the 1970s, the term had all but disappeared from this Court's jurisprudence, showing up mainly in dissenting opinions.

state government"; (2) "is not limited to a city"; and (3) "means nothing more than a local government entity created by the state to carry out 'designated' functions." 801 S.W.2d at 331–32. The Court then noted:

> The line between what is a state agency and what is a municipal corporation is not divided by whether the entity created by state statute is or is not a city, but *whether, when viewed as a whole, the entity is carrying out a function integral to state government....* [S]overeign immunity should extend only to "departments, boards or agencies that are such integral parts of state government as to come within regular patterns of administrative organization and structure."

*Id.* at 332 (quoting *Kentucky Region Eight v. Commonwealth,* 507 S.W.2d 489, 491 (Ky.1974)) (emphasis added). Immediately following this language, the Court concluded, "Kentucky Center for the Arts Corporation does not qualify for sovereign immunity under this concept." *Id.*

Ultimately, it appears that *Berns* was an attempt to generally distinguish between state agencies and municipal corporations. Despite the broad-ranging discussion on the subject, it is the narrower, "two-pronged test" that is frequently cited as *the* test for sovereign immunity. *See, e.g., Kea–Ham Contracting, Inc. v. Floyd County Development Authority,* 37 S.W.3d 703, 706 (Ky.2000); *Withers v. University of Kentucky,* 939 S.W.2d 340, 342 (Ky. 1997); *Louisville & Jefferson County Board of Health v. Calvert Investments, Inc.,* 805 S.W.2d 133, 137 (Ky.1991).

Recent decisions of this Court, however, have emphasized those parts of *Berns* dealing with whether the entity in question carries out a government function. For example, as one case noted, "The ultimate holding in *Berns* was that the Center for the Arts, though created by the state, was not entitled to immunity because it 'was not created to discharge any "governmental function," and was not "carrying out a function integral to state government."'" *Yanero,* 65 S.W.3d at 520 (quoting *Berns,* 801 S.W.2d at 330, 332); *see also Caneyville Volunteer Fire Dept. v. Green's Motorcycle Salvage, Inc.,* 286 S.W.3d 790, 802 (Ky.2009) ("The real thrust of ... *Berns* ... is whether the entity carries out an integral governmental function."); *Autry v. Western Kentucky University,* 219 S.W.3d 713, 717 (Ky.2007) ("[U]nless created to perform a governmental function, a state agency is not entitled to governmental immunity. An analysis of what an agency actually does is required to determine its immunity status." (citing *Berns* )). Though all of these decisions mention the two prongs focused on in *Berns,* they clearly demonstrate a shift in focus to the nature of the entity.

Even those cases purporting to apply the two-pronged test have mentioned this aspect of *Berns. See Kea–Ham Contracting, Inc.,* 37 S.W.3d at 706 (noting *Berns's* "key factor is ... whether, when viewed as a whole, the entity is carrying out a function integral to state government"); *Withers,* 939 S.W.2d at 344; *Calvert Investments, Inc.,* 805 S.W.2d at 137. And it is worth reiterating that *Berns* itself concluded that the "line" between being immune and non-immune is "divided by ... *whether, when viewed as a whole, the entity is carrying out a function integral to state government.*" 801 S.W.2d at 332 (emphasis added).

Though this Court's recent cases have implicitly begun to apply *Berns* so as to deemphasize the two-pronged test and focus instead on those parts of the decision about carrying out a governmental function, such an implied shift is of limited use to the bench and bar and can at times be

misleading. It is thus time to lay the cards on the table, so to speak, and explain the status of the various elements of *Berns*.

To begin with, the two-pronged "test" was useful in *Berns*, but it is best left in that case. The two prongs (or factors) were an attempt to lay down a simple formula to determine whether the entity in question was an arm of the central state government (rather than a purely local, municipal corporation). Unfortunately, the test was overly simple, failing to allow for subtlety, and too limiting. For example, because it focuses on whether the entity is a direct arm of the state, it overlooks that an entity that is the arm of a county (which in turn is a direct administrative subdivision of the state) might also qualify. In fact, because of this state-level focus, the two-pronged test is too easy to overconstrue, which arguably happened in the early cases applying it and arguably led to inconsistent results. *See, e.g., Kea–Ham Contracting, Inc.*, 37 S.W.3d at 708–709 (Johnstone, J., dissenting) (arguing that the application of the *Berns* prongs to a county entity was overly strict and inconsistent with the earlier application in *Withers*).

■ Nevertheless, the basic concept behind the two-prongs—whether the entity in question is an agency (or alter ego) of a clearly immune entity (like the state or a county) rather than one for purely local, proprietary functions—is still useful. It is an attempt to determine first whether an entity falls within the limitations on immunity found in *Haney*. Rather than attempting to reduce that idea to a simple test, however, it should instead be treated as a guiding principle, with the focus instead being on the origins of the entity. This inquiry can be as simple as looking at the "parent" of the entity in question, i.e., was it created by the state or a county, or a city? This amounts to recognizing that an entity's immunity status depends to some extent on the immunity status of the parent entity. *E.g., Autry,* 219 S.W.3d at 719 (noting that an entity "derives its immunity status through" the parent entity).

■ The more important aspect of *Berns* is the focus on whether the entity exercises a governmental function, which that decision explains means a "function integral to state government." 801 S.W.2d at 332. This determination has been the focus of sovereign immunity analysis from early on. *See Gross v. Kentucky Board of Managers of World's Columbian Exposition,* 105 Ky. 840, 49 S.W. 458, 459 (1899) (relying in part on the fact that the entity "was not created to discharge any governmental function").

This obviously will require a case by case analysis, but *Berns* itself offered a way to begin to frame the discussion by noting that sovereign immunity should "extend . . . to departments, boards or agencies that are such integral parts of state government as to come within regular patterns of administrative organization and structure." 801 S.W.2d at 332 (internal quotation marks omitted). The focus, however, is on state level governmental concerns that are common to all of the citizens of this state, even though those concerns may be addressed by smaller geographic entities (e.g., by counties). Such concerns include, but are not limited to, police, public education, corrections, tax collection, and public highways.

Actually, both of these inquiries—the sources of the entity in question and the nature of the function it carries out—are tied together to the extent that frequently only an arm of the state can exercise a truly integral governmental function (whereas municipal corporations tend to exercise proprietary functions addressing

purely local concerns). This is not a new concept:

> Municipal corporations proper are called into existence either at the direct solicitation or by the free consent of the persons composing them, for the promotion of their own local and private advantage and convenience. On the other hand: Counties are at most but local organizations, which, for the purposes of civil administration, are invested with a few functions characteristic of a corporate existence. They are local subdivisions of the state, created by the sovereign power of the state, of its own sovereign will, without the particular solicitation, consent, or concurrent action of the people who inhabit them. The former (municipal) organization is asked for, or at least assented to, by the people it embraces; the latter organization (counties) is superimposed by a sovereign and paramount authority. A municipal corporation proper is created mainly for the interest, advantage, and convenience of the locality and its people; a county organization is created almost exclusively with a view to the policy of the state at large, for purposes of political organization and civil administration, in matters of finance, of education, of provisions for the poor, of military organization, of the means of travel and transport, and especially for the general administration of justice. With scarcely an exception, all the powers and functions of the county organization have a direct and exclusive reference to the general policy of the state, and are, in fact, but a branch of the general administration of that policy.

*Marion County v. Rives & McChord*, 133 Ky. 477, 118 S.W. 309, 311 (1909) (internal quotation marks omitted). Of particular interest here is that functions carried out by the county are usually state functions and that "the policy of the state at large ... in the means of travel and transport" is, or at least can be, a county (and state) concern, rather than a municipal concern.

It is with this latter statement that the nature of the Airport Board and Airport Corporation in this case become clear.

■ Airport boards may be created by "[a]ny urban-county government, city, or county, or city and county acting jointly, or any combination...." KRS 183.132(1). As noted by the Court of Appeals in *Inco, Ltd.*, it is not clear whether the City of Lexington or Fayette County initially created the Airport Board, but upon the merger of the city and the county to create the Lexington–Fayette Urban County Government, "every function [the city] sponsored became a county agency...." 705 S.W.2d at 934. The record in this case is no clearer as to the origin of the Board, but the principle in *Inco, Ltd.* is sound. At the merger of the city and the county, the newly formed Urban County Government became the (possibly adoptive) "parent" entity of the Airport Board.

This is further supported by the fact that the Urban County Government retains significant control over the board. The members of the Airport Board are appointed by the mayor. KRS 183.132(4)(e). The mayor, or his representative, also sits on the Board. *Id.* The accounting books of the Board "shall at all times be subject to examination by the legislative body ... by whom the board was created." KRS 183.132(15). The Board is required to submit an annual "detailed report of all acts and doings of the board to the legislative body or bodies by whom the board was created." *Id.* The most control, however, stems from KRS 183.133(6), which states:

> The board or any other governmental unit may from time to time make, adopt and enforce such rules, regulations and

ordinances as it may find necessary, desirable or appropriate for carrying into effect the purposes of this chapter, including those relating to the operation and control of the airport, airport facilities or air navigation facilities owned or operated by such board or such other governmental unit.

The term "governmental unit" includes "urban-county government," KRS 183.012(2), meaning that under KRS 183.133(6), the Urban County Government can exercise regulatory control over the Board and the airport if it sees fit to do so.

The Airport Board also carries out a function integral to state government in that it exists solely to provide and maintain part of the Commonwealth's air transportation infrastructure (i.e., the airport). The statutory purpose of airport boards is "to establish, maintain, operate, and expand necessary, desirable or appropriate airport and air navigation facilities," and they "shall have the duty and such powers as may be necessary, or desirable to promote and develop aviation, including air transportation, airports and air navigation facilities." KRS 183.133(1). As argued by the Board and Corporation, this function is, in many ways, analogous to the provision of county roads and state highways. Though the analogy is imperfect, since the Airport Board does not own or maintain the airways themselves (an impossibility, actually), it is sufficient because the board, by providing the airport, provides the primary means for accessing those airways, which in turn are essential for commercial and private transportation of people, cargo, and mail. *See also* KRS 183.200 ("Recognizing that the rapid development of a statewide system of airports is of prime importance in the industrial development of the state, the General Assembly reaffirms its previous declarations that the acquisition, establishment, construction, enlargement, improvement, maintenance,

equipping and operation of airports is a public purpose, and further declares assistance in the financing of local airport projects to be within the proper province of state government."); KRS 183.123 ("The acquisition of any lands for the purpose of establishing airports or other air navigation facilities; ... the acquisition, establishment, construction, enlargement, improvement, maintenance, equipping, and operation of airports and other air navigation facilities, whether by the state separately or jointly with any governmental unit thereof or air board ... *are hereby declared to be public and governmental functions exercised for a public purpose, and matters of public necessity ....*" (emphasis added)).

It is also important that the Board is "a legislative body for the purposes of KRS 183.630 to 183.740 [the statutes relating to the issuance of bonds]." KRS 183.132(3). The power to legislate is one of the core functions of government. Though this legislative capacity is only one small aspect of the Board, it is nevertheless telling about the overall nature of the entity. It is also worth noting that even the cases most restrictive of immunity admit that legislative and quasi-legislative functions are entitled to immunity. *E.g., Haney,* 386 S.W.2d at 742.

Comair argues that the Airport Board is "engaged in a proprietary venture, i.e., transportation." This, however, imputes too much function and activity to the Board, which does not actually provide transportation services, for example, by operating an airplane to transport people. Instead, it provides the runways, terminals, and other infrastructure that private airline companies like Comair use (admittedly for a fee) to provide those transportation services. Comair's reasoning is akin to saying that the Transportation Cabinet

is engaged in the business of transportation because it facilitates private and commercial transportation (e.g., by trucking companies) by building roads and highways (and even charges a fee for their use at times with toll booths). But the Cabinet (like the Board) is actually in the "business" of providing transportation infrastructure, which is a quintessential state concern and function, one that is very different from the business of transportation itself.

The fact that the Board has substantial revenue from fees charged while operating the airport also does not make the activity proprietary. Partly this is because fees, authorized by KRS 183.33, are but one of many ways an airport board can generate revenue. An airport board can also receive money from its local government, including counties and urban-county governments, which may impose taxes and appropriate money from their general funds to support the creation, expansion, and operation of airports. *See* KRS 183.134. Most importantly, however, an airport board can issue revenue bonds, KRS 183.136, which, as noted above, is a legislative function.

Also, the Board is far more limited than a private entity when setting the fees it charges for some of its services (use of the landing area, etc.), since the fees can only be "reasonable" and are subject to judicial review, much like an administrative agency's decisions. KRS 183.133(2). The Board is not a for-profit entity. Its revenues are to be used solely to make improvements and to maintain the airport itself through employees and contracts with construction and service providers.

■ Comair also argues that the Airport Board over the years has held itself out to be a wholly private entity independent of the Lexington–Fayette Urban County Government. This argument cuts both ways, since in many documents—including the annual financial report, the bond issue documents, and the lease of the airport real estate from the Airport Corporation (which holds title) to the Board and the Urban County Government—the Board refers to itself as an agency of the Urban County Government. Ultimately, however, such statements by the entity are not controlling. As noted in *Autry*, "An analysis of what an agency actually does is required to determine its immunity status." 219 S.W.3d at 717.

An examination of the "parent" and the function of the Airport Board thus reveals that the Court of Appeals was correct in *Inco, Ltd.* in holding that the Board was a county agency entitled to the protection of sovereign immunity. The Urban County Government is the parent of the Board and continues to exercise some control over the entity. But perhaps more importantly, the Board's sole function is to provide vital transportation infrastructure for the people of the Commonwealth, which is an integral function of state government. The Airport Board is therefore entitled to immunity.[6]

■ This analysis is not quite as neat as to the Airport Corporation, in part because it is a true corporation that was created by filing Articles of Incorporation with the Secretary of State. This is important because the Airport Corporation, not the Airport Board, holds title to all the real estate that makes up the Blue Grass Airport. Upon closer examination, however, it is evident that the Corporation is little more

---

6. The question of whether a wholly municipal airport board, which the statutes allow, and which performs the same function, is entitled to immunity involves further considerations, is not before the Court, and will not be decided herein.

than an alter-ego of the Board, created primarily to take advantage of certain types of financing, much like the Student Life Foundation in *Autry v. Western Kentucky University.*

According to its Articles of Incorporation filed with the Secretary of State in 1976, the Corporation was established as a non-profit, non-stock corporation. It was formed pursuant to resolutions of both the Airport Board and the Lexington–Fayette Urban County Government. The primary purpose of the corporation, according to the Articles of Incorporation, is "to act as a 'public agency' of the State of Kentucky as well as an agency for financing purposes for the benefit of the Airport Board and the Urban County Government, it being formed as authorized ... for 'governmental' purposes...." Though the creation of a separate entity from the Airport Board does not appear to be anticipated by KRS Chapter 183, the choice of form is explained in the original Articles of Incorporation as a way to take advantage of "a plan of financing of the type approved by the Court of Appeals of Kentucky known as the 'holding company' plan."[7] Upon dissolution of the corporation, all its assets revert back to the Airport Board and the Urban County Government.

The Articles of Incorporation were amended in 1984 pursuant to resolutions adopted by the Board of Directors of the Airport Corporation, the Airport Board, and the Lexington–Fayette Urban County Council. The amended articles include provisions similar (if not functionally identical) to those in the original articles. The amended articles include a new provision stating that the Airport Corporation

is created subject to the condition that the governing body of the Airport Board and the governing body of the Urban County Government shall exercise (a) organizational control over the Corporation ...; or (b) supervisory control over the Corporation as may be deemed proper by the Airport Board and the Urban County Government in the administration of the activities of the Corporation....

The amended articles also provide that all revenue beyond that used to retire the debt of the corporation shall inure only to the benefit of the Airport Board and the Urban County Government.

■ Most telling, however, is that according to the deposition of John Rhodes, the Corporation was created to issue bonds to finance airport improvements. Creation of a new entity by an otherwise immune entity simply to take advantage of a funding mechanism does not cut off the immunity defense for the new entity. *See Autry,* 219 S.W.3d at 719 (noting that an entity "derives its immunity status through" the parent entity). Ultimately, the Corporation has the same governmental function and parent as the Board. Thus, it enjoys the same immunity as the Board.

■ Finally, Comair argues that the members of the Airport Board cannot claim immunity when sued in their official capacity because the Board as an entity is not entitled to immunity. This issue is moot because, as discussed above, the Board and Corporation are cloaked in sovereign immunity. Therefore, the members of the Board, when sued in their representative capacity, are immune. *Yanero,* 65 S.W.3d at 522.

---

**7.** The "holding company plan" concept appears to have been approved, at least in part, in *Sawyer v. Jefferson County Fiscal Court,* 438 S.W.2d 531 (Ky.1969), and the cases cited therein.

Comair has not raised the issue of the board members' entitlement to qualified official immunity, though they were also sued in their individual capacities. Because the issue has not been appealed, this Court need not address it.

### III. Conclusion

The Lexington–Fayette Urban County Airport Board and the Lexington–Fayette Airport Corporation are agencies of the Lexington–Fayette Urban County Government. By providing essential transportation infrastructure to the citizens of the Commonwealth, both the Board and Corporation are exercising a function integral to state government. Therefore, both entities are covered by sovereign immunity and cannot be held liable in tort. Additionally, the members of the Board, in their official or representative capacities, are immune.

For the foregoing reasons, the judgment of the Fayette Circuit Court is affirmed.

All sitting. All concur.