**Charles L. WILSON, Jr., Appellant**

v.

**CITY OF CENTRAL CITY, Kentucky, Appellee.**

**No. 2010–SC–000394–DG.**

Supreme Court of Kentucky.

April 26, 2012.

Rehearing Denied Aug. 23, 2012.

---

Richard E. Peyton, Frymire, Evans, Peyton, Teague & Cartwright, Madisonville, KY, Counsel for Appellant.

Randall Hardesty Franklin, Gordon, & Hobgood, Madisonville, KY, Counsel for Appellee.

Christopher James Gadansky, Robert Thomas Watson, McBrayer, McGinnis, Leslie & Kirkland, PLLC, Louisville, KY, Counsel for Amicus Curiae.

Opinion of the Court by Justice SCOTT.

This case presents the question of whether Kentucky's Whistleblower Act protects city employees. The Muhlenberg Circuit Court granted summary judgment for the City of Central City, Kentucky ("Central City"), although that court did not address the issue before us. The Court of Appeals affirmed, concluding that cities are not "employers" under the Whistleblower Act, and therefore are not subject to it. We granted discretionary review and, because we agree that cities are not "employers" under the Whistleblower Act, we affirm.

## I. BACKGROUND

The Central City Water Works Department hired Appellant, Charles L. Wilson, Jr. ("Wilson"), in April 1982. Three years later, Wilson was promoted to Chief Operator of the Water Treatment Plant. During his tenure at the Water Works Department, Wilson became concerned with several safety issues, which he promptly reported to the appropriate regulatory agencies. These concerns led to multiple written reprimands in the late 1990s by the Kentucky Division of Water against the Water Works Department.

While some of the safety issues were resolved, others persisted, which led Wilson to contact a member of the Central City Water Board and a member of the Central City Council. Wilson later contacted the Occupational Safety and Health Administration to report safety concerns. In 2002, Wilson again reported safety concerns to several employees of the Kentucky Division of Water. One of the employees asked to speak with Wilson's supervisor, Jim Brown, but Brown refused to do so, although Wilson suggested to Brown that he work with the Division of Water to remedy the problems.[1]

Later, in June 2003, amid Wilson's ongoing divorce, allegations were made that he had excessively used his city computer for personal reasons, neglected his work

---

1. Wilson also reported several concerns shortly after he was initially suspended in June 2003.

duties, mismanaged the water plant, and abused his authority. Wilson admits that he used his city computer for personal emails, to research custody-related issues, and to access online dating websites. At least one co-worker witnessed Wilson frequently using the computer for personal reasons, as well as using several reams of paper to print divorce-related information. These allegations made their way to Central City Mayor Hugh Sweatt, who asked Jim Brown to investigate. The allegations were confirmed and Sweatt fired Wilson on June 30, 2003. Wilson's termination letter indicates that he was terminated for: (1) "Gross unauthorized use of a City computer located at the water plant"; and (2) "Neglect of duties, mismanagement of the water plant, and abuse of authority."

Wilson appealed his termination to the City Council, which conducted a hearing and affirmed the mayor's decision. Wilson then brought a civil action in the Muhlenberg Circuit Court arguing that he was not a terminable "at-will" employee, and that he was terminated in retaliation for notifying authorities that the Central City Water Works Department was operated in violation of the employee safety and public water supply safety rules and regulations. The trial court granted summary judgment in favor of Central City, finding that Wilson was an "at-will" employee, and thus terminable at anytime, with or without

cause. It also found that Wilson had not reported a violation of a state statute or administrative regulation as required by the Whistleblower Act ("the Act"), and that any reports he *had* made were too temporally attenuated to be a "contributing factor" to his termination under the statute.[2] Wilson appealed.

The Court of Appeals affirmed, agreeing that Wilson was an at-will employee.[3] It also found that Wilson was not protected by the Whistleblower Act, albeit for a different reason than did the trial court. Specifically, it held that Central City, as a municipality, was not a "political subdivision" of the Commonwealth, and therefore could not be an "employer" under the statute. Thus, the court concluded that Wilson was not protected by the Act.[4] Wilson petitioned for rehearing in the Court of Appeals, but was denied. We then granted discretionary review.

## II. ANALYSIS

◼ Wilson argues that Kentucky's Whistleblower Act, codified at KRS 61.101 *et seq.*, applies to cities as employers. The Act states:

No employer shall subject to reprisal ... any employee who in good faith reports, discloses, [or] divulges ... any facts or information relative to an actual or suspected violation of any law, stat-

2. Specifically, the trial court found that the reports Wilson made came either after he had been suspended pending his investigation or more than a year prior to the suspension. The court concluded that these reports could not be found to be a contributing factor in his termination as a matter of law.

3. This finding has not been appealed to this Court.

4. In dicta, the Court of Appeals went on to address the trial court's holding that Wilson's complaints were too temporally attenuated to be a contributing factor in his termination as

a matter of law. First, the Court of Appeals agreed "that no reasonable person could conclude that activities that occurred after Wilson's suspension could have contributed to that suspension." On the other hand, the Court of Appeals found the trial court's conclusion as to disclosures made more than a year prior to Wilson's suspension erroneous, noting that KRS 61.103(1)(b) entitles an employee to the presumption that a disclosure was a contributing factor. Thus, an employee should not be foreclosed from proving that a disclosure was a contributing factor due to the absence of "temporal juxtaposition."

ute, executive order, administrative regulation, mandate, rule, or ordinance of the United States, the Commonwealth of Kentucky, or any of its political subdivisions, or any facts or information relative to actual or suspected mismanagement, waste, fraud, abuse of authority, or a substantial and specific danger to public health or safety.

KRS 61.102(1). Under the Act, "[e]mployer means the Commonwealth of Kentucky *or any of its political subdivisions*." KRS 61.101(2). Wilson contends that cities are "political subdivisions" of the Commonwealth. As such, he argues, he was an employee of a political subdivision, and therefore protected by the Whistleblower Act. *See* KRS 61.101(1) (defining "employee" as "a person in the service of the Commonwealth of Kentucky, or any of its political subdivisions ..."). Thus, we must determine whether a city is a "political subdivision" of the Commonwealth for purposes of the Act.

We pause first to address terminology. For decades.(if not longer), this Court's opinions have muddied the waters with respect to any distinction between a "city," a "municipality," and a "municipal corporation." This line-blurring should not come as a surprise, considering the nature of the three terms. For example, a city is "[a]n incorporated [ ] municipality with definite boundaries and legal powers set forth in a charter granted by the state." *Webster's II New College Dictionary* 210 (3d ed.2005). On the other hand, a municipality is not necessarily a city, but may be; it is "[a] political unit, as a city, town, or village, incorporated for local self-govern-

ment [purposes]." *Id.* at 738. To be sure, both "cities" and "municipalities" are municipal corporations. *See* 62 C.J.S. *Municipal Corporations* § 2 (1999). And a city is both a "municipality" and a "municipal corporation." *Id.* at § 2(b). However, "municipality" can be a synonym for "municipal corporation" or "city," *see id.* at § 2(b) & (d), even though municipal corporations can be much larger than a city (or, indeed, much smaller).[5]

What the above discussion serves to emphasize is that the line between a city, a municipality, and a municipal corporation is not always clear. The Court of Appeals in this case used the word "municipality" when referring to Central City. Appellant's brief uses the words "municipality" and "municipal corporation" interchangeably, as does Appellee's brief. Nonetheless, Appellee is a *city*, and thus our analysis must be strictly limited, as much as possible, to whether *cities* are "political subdivisions" under the Whistleblower Act.

Unfortunately, the KRS is riddled with provisions that use the terms "city," "municipality," and "municipal corporation," often with no discernible distinction.[6] This distinction, however, is becoming much more important as the Kentucky General Assembly, in its quest to provide efficient protections and services, creates geographic districts for the delivery of those protections and services. Water treatment, fire fighting, public transportation, public education, police, corrections, and tax collection are all examples of services that are provided by a non-city municipal corpora-

---

**5.** To show just how complicated this discussion can become, *Corpus Juris Secundum* allocates four (4) entire volumes to "municipal corporations." Furthermore, over forty (40) pages of the Kentucky's Revised Statutes General Index are dedicated to provisions relating to "municipal corporations," and Kentucky

Digest 2d dedicates over 1,000 pages to "municipal corporation" case descriptions.

**6.** Indeed, under both "CITIES" and "MUNICIPALITIES" in the index to Kentucky's Revised Statutes, it states only: "See MUNICIPAL CORPORATIONS."

tion in some areas, but provided by a city in other areas. The legal status of the entities providing the services depends on the distinction between "municipal·corporation" and "city." This is because, although a city is a municipality *and* a municipal corporation, a service or protection district (which may be larger than a city) is a municipal corporation, but *not* a "municipality." Thus, we will refer to non-city municipal corporations as "municipal corporations," and cities as "cities" or "municipalities."[7] With these points in mind, we turn to the specifics of the case before us.

 We begin, as we must, with the plain language of the statute. *See, e.g., Brownlee v. Commonwealth,* 287 S.W.3d 661, 664 (Ky.2009). "Where the words of the statute are clear and unambiguous and express the legislative intent', there is no room for construction or interpretation and the statute must be given its effect as written." *Lincoln Cnty. Fiscal Court v. Dep't of Pub. Advocacy,* 794 S.W.2d 162, 163 (Ky.1990) (citation omitted). On its face, the Whistleblower Act applies only to "the Commonwealth of Kentucky or any of its political subdivisions," and persons "authorized to act on behalf of the Commonwealth, or any of its political subdivisions, with respect to formulation of policy or the supervision, in a managerial capacity, of subordinate employees." KRS 61.101(2). Although "political subdivisions" is not defined, the Act makes no reference to "cities," "municipalities," or "municipal corporations." We start with the assumption that had the legislature intended the Whistleblower Act to apply broadly to municipalities, it would have explicitly included them in their definition of "employer."

This assumption is supported by numerous Kentucky laws in which the General Assembly has designated municipalities as separate from either the Commonwealth or its political subdivisions. See Ky. Const. § 177; KRS 18A.160(2); KRS 56.460; KRS 58.150(8); KRS 58.410; KRS 61.900(7); KRS 76.269; KRS 187.610; KRS 224.60–115(14); KRS 235.410(3); KRS 318.010(9); and KRS 341.055(4).[8] Thus, we should not read the word "municipality" into a statute when the General Assembly has shown a clear ability to include it if it desires to.

On the other hand, there are several provisions in the KRS that include "cities" in a list of "political subdivisions." *See* KRS 39D.020(1); KRS 45.570(1). In light of the legislature's various conjunctive and disjunctive uses of the terms "municipalities" and/or "cities" with "political subdivision," we must look deeper to discern the legislative intent behind the Whistleblower Act.

The legislative history of the Act indicates a deliberate intention by the General Assembly to *exclude* cities from its prohibitions. The statute was originally enacted in 1986 and last amended in 1993. Prior to the 1993 amendment, the Task Force on Governmental Ethics ("TFGE") was created to, among other things, determine whether a comprehensive local government code of ethics should be established to apply to a wide range of public officials, including all elected city officials and many appointed city officials. Ultimately, the TFGE approved Bill Request 108 ("BR 108"), which proposed to create a new section under Chapter 61 of the Kentucky Revised Statutes, KRS Chapter 61A, establishing a code of ethics, *including* whis-

---

7. We note, however, that some of the sources from which we quote did not make this distinction.

8. It appears that, in each of these instances, the General Assembly is using the term "municipality" to refer broadly to all "municipal corporations," including cities.

tleblower provisions applicable to cities in the Commonwealth.[9] KRS Chapter 61A would have instituted sweeping reform and placed strict guidelines and requirements on city officials and lobbyists.

BR 108 was eventually replaced by Senate Bill 335 ("SB 335") which was substantively similar to its predecessor. SB 335 would have created the Kentucky Local Government Ethics Commission (LGEC) to oversee local government officers, including city officers. The bill, if passed, would have provided whistleblower protections to at least a city employee who reported violations to the LGEC. However, the bill was never heard in committee. Instead, that same session, the General Assembly heard and adopted House Bill 238 ("HB 238"). HB 238 was eventually signed into law, creating a new section of Chapter 65 of the Kentucky Revised Statutes, requiring "[t]he governing body of each city ... [to] adopt, by ordinance, a code of ethics which shall apply to all elected officials...." KRS 65.003.

Thus, the General Assembly had before it, *in the same session,* the option of adopting a comprehensive ethics code applicable to cities, which included whistleblower protections as afforded under KRS 61.101 *et seq.,* or adopting a mandate requiring cities to regulate themselves without reference to the Whistleblower Act. The former never made it to committee; the latter became law. This strongly suggests that the General Assembly's intent was to exclude cities from the Whistleblower Act's prohibitions.

Our case law also supports the conclusion that cities are not "political subdivisions" under the Whistleblower Act. For instance, our sovereign immunity jurisprudence has long distinguished between counties, which are protected by sovereign immunity, and municipalities, which are not. *Compare Lexington–Fayette Urban Cnty. Gov't v. Smolcic,* 142 S.W.3d 128, 132 (Ky.2004) ("Kentucky counties are cloaked with sovereign immunity. This immunity flows from the Commonwealth's inherent immunity by virtue of a Kentucky county's status as an arm or political subdivision of the Commonwealth") *with Bolden v. City of Covington,* 803 S.W.2d 577, 579 (Ky. 1991) ("[m]unicipal corporations enjoy no constitutional protection from tort liability"). While not dispositive with respect to the issue before us, this distinction is certainly relevant because the immunity cases discuss the historic legal differences between municipalities and political subdivisions.

For example, we have noted that "'[c]ounties are unincorporated political subdivisions of the state, preexisting its formation, whose existence is provided for constitutionally in Sections 63, 64, and 65 of the Kentucky Constitution.' In other words, an unincorporated county government is not a 'municipality' under Kentucky law." *Smolcic,* 142 S.W.3d at 133–34 (quoting *Calvert Invs., Inc. v. Louisville & Jefferson Cnty. Metro. Sewer Dist.,* 805 S.W.2d 133, 138 (Ky.1991)). And in the close immunity cases, where the issue was whether sovereign immunity extended to a particular entity, we recognized that while there are a number of factorial considerations, "Kentucky plac[es] greater weight on the extent to which the entity engages in an essential [state] government function." *Caneyville Volunteer Fire Dep't v. Green's Motorcycle Salvage, Inc.,* 286 S.W.3d 790, 804 (Ky.2009) (citing *Kentucky Ctr. for the Arts v. Berns,* 801 S.W.2d 327, 332 (Ky.1990); *Schwindel v. Meade Cnty.,* 113 S.W.3d 159, 168 (Ky.2003); *Autry v. Western Ky. Univ.,* 219 S.W.3d 713, 717 (Ky.2007)). We believe that a similar in-

---

9. The whistleblower provision in BR 108 was taken almost verbatim from KRS 61.102.

quiry is necessary in determining whether an entity qualifies as a "political subdivision" under the Whistleblower Act.

Whether an entity is or is not a political subdivision is not always clear. The immunity cases suggest that all we know for sure is that counties are cloaked with sovereign immunity, *e.g., Smolcic,* 142 S.W.3d at 132, and cities are not, *e.g., Bolden,* 803 S.W.2d at 579–80. This is because "the main purpose of counties has been to function as administrative subdivisions of the state." Thomas P. Lewis, James S. Kotas, and Charles N. Carnes, *Consolidation— Complete or Functional—of City and County Governments in Kentucky,* 42 Ky. L.J. 295, 298 (1953–54). On the other hand, cities are incorporated to manage purely local governmental functions, not to be agents of the central state government.

*See generally* 62 C.J.S. *Municipal Corporations* § 2 (1999).

Numerous other entities, however, fall outside this taxonomy of city versus state and county, and it is not immediately clear whether they are agencies of the state, and therefore possibly entitled to immunity, or more akin to municipal corporations, and are therefore liable in tort. These in-between entities have given courts the most trouble in recent years.

*Comair, Inc. v. Lexington–Fayette Urban Cnty. Airport Corp.,* 295 S.W.3d 91, 95 (Ky.2009). In *Comair,* we addressed how to resolve the immunity status of entities falling within this gray area. We cite *Comair* with approval in how to resolve whether one of these entities is subject to the Whistleblower Act.[10],[11]

---

**10.** Specifically, the *Comair* test mandates a case-by-case analysis focusing, in general, on "whether the entity exercises a governmental function, which [ ] means a 'function integral to state government.'" 295 S.W.3d at 99 (citing *Berns,* 801 S.W.2d at 332). This will be discussed in more detail *infra* at footnote 11.

**11.** Wilson points us to the recently decided case of *Kindle v. City of Jeffersontown, Kentucky,* 374 Fed.Appx. 562 (6th Cir.2010), in which the Sixth Circuit found that municipalities *are* subject to the Whistleblower Act. *Id.* at 567. In doing so, the Sixth Circuit relied on this Court's decision in *Consolidated Infrastructure Management Authority, Inc. v. Allen,* 269 S.W.3d 852 (Ky.2008). Because in *Allen* we upheld a jury award under the Act against a municipal corporation, the Sixth Circuit assumed that we implicitly "approved of applying the [ ] Act to a municipality." 374 Fed.Appx. at 566. This reliance was misplaced insofar as that court equated "municipality" with "city."

First, the reason we upheld the cities' liability in *Allen* was not because we found them to be "political subdivisions" of the Commonwealth, and therefore "employers" under the Act. That issue was not before us. The cities' liability was derivative of their absorption of the Consolidated Infrastructure Management

Authority (CIMA), which was the entity on which the proverbial whistle was blown, and the original liable party. CIMA dissolved shortly after the trial concluded, and was absorbed by the cities of Russellville and Auburn. Thus, all we approved of in *Allen* was the derivative liability of the cities.

The judgment continues to be enforceable against those entities: "Thus, if a municipal corporation goes out of existence by being annexed to, or merged in, another corporation, and if no legislative provision is made respecting the property and liabilities of the corporation which ceases to exist, the corporation to which it is annexed, or in which it is merged, is entitled to all its property and is answerable for all its liabilities." 56 Am.Jur.2d, *Municipal Corporations, Etc.* § 80 (2008).

*Allen,* 269 S.W.3d at 857.

Second, as indicated above, there is a gray area between counties, which are political subdivisions of the Commonwealth, and cities, which are not. Whether an entity falling within that gray area is a "political subdivision" under the Whistleblower Act is to be resolved in the same way that we resolve whether an entity is protected from suit by sovereign immunity. In *Comair,* we drew upon, but refocused, the *Berns* test for determining immunity status with a test that fo-

This case, however, does not present a gray-area entity. Appellee is a city, and we are convinced that the General Assembly deliberately excluded cities from the Whistleblower Act. Thus, we hold that cities are not "political subdivisions" under the Whistleblower Act, and that Wilson was therefore not protected by its provisions.[12] This conclusion is supported by the statute's plain language, its legislative history, and analogous case law.

## III. CONCLUSION

In sum, we hold that cities are not political subdivisions under Kentucky's Whistleblower Act, and city employees are therefore not protected by the Act. Accordingly, we affirm the judgment of the Court of Appeals.

All sitting. All concur.

cuses on "whether the entity exercises a governmental function, which [*Berns*] explains means a 'function integral to state government." 295 S.W.3d at 99 (citing *Berns*, 801 S.W.2d at 332). "The focus," *Comair* directs, "is on *state level governmental concerns that are common to all of the citizens of this state, even though those concerns may be addressed by smaller geographic entities....*" *Id.* (emphasis added); *see also Caneyville*, 286 S.W.3d at 802 ("although the courts have engaged in somewhat of a hodgepodge of factorial considerations, Kentucky follows the [ ] approach in placing greater weight on the extent to which the entity engages in an essential [state] government function"). In *Comair*, we held that the Lexington–Fayette Urban County Airport and its Board were entities that fell within this definition, and were therefore protected by sovereign immunity. 295 S.W.3d at 104.

To repeat, whether cities or municipalities are "political subdivisions" under the Act was *not* a question presented by *Allen*. In *Allen*, CIMA administered water and sewer services

for the cities of Russellville and Auburn. 269 S.W.3d at 854. Thus, it was larger than a city, but smaller than a county; it was one of those gray-area entities. In upholding liability against CIMA, we did *not* implicitly hold that cities are subject to the Whistleblower Act; we implicitly recognized CIMA as an entity that, in providing clean water, sanitation, and a functioning sewer system, addressed "state level governmental concerns that are common to all of the citizens of this state." *Comair*, 295 S.W.3d at 99. Today, we reaffirm that decision.

12. The record reveals that Wilson, in good faith, reported several safety concerns to the appropriate agencies. We regret that a factfinder cannot determine whether his whistleblowing activities were a "contributing factor" to his termination under KRS 61.102. However, until and unless the General Assembly unambiguously demonstrates its intent that the Whistleblower Act protects city employees, we are resigned to conclude that it does not.