RENDERED: APRIL 23, 2026
TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0284-DG

HMB PROFESSIONAL ENGINEERS, INC.; D. PAUL LINCKS; AND HAWORTH-MEYER-BOLEYN PROFESSIONAL ENGINEERS, INC.     APPELLANTS

V.     ON REVIEW FROM COURT OF APPEALS
NOS. 2021-CA-1187, 2021-CA-1223, 2021-CA-1264, 2021-CA-1445, & 2021-CA-1501
FAYETTE CIRCUIT COURT NO. 19-CI-00334

KRISTINA L. IVES, INDIVIDUALLY; KRISTINA L. IVES, AS THE NEXT FRIEND FOR THE MINOR CHILDREN, HIRAM MILLER IVES AND JUNE LELIA IVES; AND KRISTINA L. IVES, AS THE PERSONAL REPRESENTATIVE AND ADMINISTRATRIX OF THE ESTATE OF HIRAM DUDLEY IVES, III     APPELLEES

AND

2024-SC-0289-DG

HDR ENGINEERING, INC. AND JAMES L. GUINN     APPELLANTS

V.     ON REVIEW FROM COURT OF APPEALS
NOS. 2021-CA-1187, 2021-CA-1223, 2021-CA-1264, 2021-CA-1445, & 2021-CA-1501
FAYETTE CIRCUIT COURT NO. 19-CI-00334

KRISTINA L. IVES, INDIVIDUALLY; D.                          APPELLEES
PAUL LINCKS; HAWORTH-MEYER-
BOLEYN PROFESSIONAL
ENGINEERS, INC.; HMB
PROFESSIONAL ENGINEERS, INC.;
JENNINGS L. COPLEY; KRISTINA
IVES, AS THE PERSONAL
REPRESENTATIVE AND
ADMINISTRATRIX OF THE ESTATE OF
HIRAM DUDLEY IVES, III; KRISTINA
IVES, AS NEXT FRIEND FOR THE
MINOR CHILDREN, HIRAM MILLER
IVES AND JUNE LELIA IVES; NECTO
ARCHITECTURE, PSC; PARSONS
BRINCKERHOFF, INC.; SUSAN
ROWLAND SLADE, AS PERSONAL
REPRESENTATIVE AND EXECUTRIX
OF THE ESTATE OF FRANK STEVEN
SLADE; AND WSP USA INC.

AND

2024-SC-0291-DG

WSP USA INC.; PARSONS                                      APPELLANTS
BRINCKERHOFF, INC.; AND SUSAN
ROWLAND SLADE, AS PERSONAL
REPRESENTATIVE AND EXECUTRIX
OF THE ESTATE OF FRANK STEVEN
SLADE

ON REVIEW FROM COURT OF APPEALS
V.          NOS. 2021-CA-1187, 2021-CA-1223, 2021-CA-1264,
                2021-CA-1445, & 2021-CA-1501
            FAYETTE CIRCUIT COURT NO. 19-CI-00334

KRISTINA L. IVES, INDIVIDUALLY; D.                         APPELLEES
PAUL LINCKS; HAWORTH-MEYER-
BOLEYN PROFESSIONAL
ENGINEERS, INC.; HDR
ENGINEERING, INC.; HMB
PROFESSIONAL ENGINEERS, INC.;

2

JAMES L. GUINN; JENNINGS L. COPLEY; KRISTINA L. IVES, AS THE NEXT FRIEND FOR THE MINOR CHILDREN, HIRAM MILLER IVES AND JUNE LELIA IVES; KRISTINA L. IVES, AS THE PERSONAL REPRESENTATIVE AND ADMINISTRATRIX OF THE ESTATE OF HIRAM DUDLEY IVES, III; AND NECTO ARCHITECTURE, PSC

AND

2024-SC-0295-DG

HMB PROFESSIONAL ENGINEERS, INC.; D. PAUL LINCKS; AND HAWORTH-MEYER-BOLEYN PROFESSIONAL ENGINEERS, INC.                APPELLANTS

ON REVIEW FROM COURT OF APPEALS
V.        NOS. 2021-CA-1187, 2021-CA-1223, 2021-CA-1264, 2021-CA-1445, & 2021-CA-1501
FAYETTE CIRCUIT COURT NO. 19-CI-00334

JENNINGS L. COPLEY; KRISTINA IVES, AS THE NEXT FRIEND FOR THE MINOR CHILDREN, HIRAM MILLER IVES AND JUNE LELIA IVES; KRISTINA IVES, AS THE PERSONAL REPRESENTATIVE AND ADMINISTRATRIX OF THE ESTATE OF HIRAM DUDLEY IVES, III; KRISTINA L. IVES, INDIVIDUALLY; AND NECTO ARCHITECTURE, PSC                APPELLEES

**OPINION OF THE COURT BY JUSTICE BISIG**

**AFFIRMING**

Jennings Copley II and his business partner, Hiram "Dudley" Ives III, were traveling on Interstate 65 (I-65) near Hart County when their rental vehicle hydroplaned and was ultimately struck by a tractor trailer. The accident killed Ives and seriously injured Copley. Ives' widow, Kristina, on behalf of herself, her minor children and her husband's estate, along with Copley, sued the engineers who designed the widening of I-65 years prior. Ives and Copley asserted that the engineers negligently designed the highway, ultimately causing more water to pool on the roadway and thus increasing the occurrence of hydroplaning incidents. The three engineering firms that consulted the Kentucky Transportation Cabinet on the highway design strongly contested these allegations, asserting that their designs complied with the governing state and federal standards for highways.

The Fayette Circuit Court granted the engineers' motion for summary judgment, determining that they were immune from suit. Further, the trial court held that the claims were federally preempted. The Court of Appeals reversed, and the Engineers sought discretionary review in this Court. After granting discretionary review, considering oral arguments, and carefully reviewing the record, we affirm the Court of Appeals.

**FACTS AND PROCEDURAL HISTORY**

For nearly fourteen years, the Kentucky Transportation Cabinet (KYTC) consulted with several engineering firms to collaboratively design a widened Interstate 65 (I-65) through Hart, Larue, and Hardin Counties. The KYTC hired WSP USA, Inc., as its lead engineer on the project. WSP then retained HMB

4

Professional Engineers and HDR Engineering as subconsultants (collectively referred to as the "Engineers"). Because I-65 is part of the National Highway System (NHS), the final design plan had to be approved by the Federal Highway Administration (FHWA) pursuant to federal law that requires that all national highways meet FHWA design standards and criteria. Kentucky highway designs must also comply with state standards.

Prior to construction, this portion of I-65 contained two lanes on each side with a grass median dividing the north and southbound lanes. The widening project first involved a determination that the new lanes would be added to I-65 by replacing the grassy median that divided the two sides of the interstate with a concrete median barrier wall. The Engineers proposed four alternative designs to the KYTC at the outset of the project: two designs that involved maintaining the existing grass median, and two designs that involved adding a concrete barrier to separate the north and southbound lanes. [1] The project resulted in a fourteen-foot shoulder next to the concrete barrier wall, three twelve-foot travel lanes, followed by a twelve-foot right shoulder on each side of I-65. In short, the Engineers' design widened the highway from four to six lanes.

Years after construction was complete, Jennings Copley II was driving a rental car to Lexington from Western Kentucky with his business partner,

---

[1] Factors contributing to the decision to replace the grassy median with a concrete barrier wall included: (1) less adverse environmental impacts; (2) reduction in right of way impact; (3) fewer utility impacts; (4) lower construction cost; and (5) reduction in potential for median crossovers and head-on collisions.

Hiram "Dudley" Ives III, riding as his passenger. While traveling northbound on I-65, they encountered a heavy rainstorm. The vehicle hydroplaned and travelled from the far-left lane across the highway to the right shoulder, where it struck a guardrail. The vehicle then rolled backwards onto the highway and was struck by a tractor trailer. The collision killed Ives and seriously injured Copley. Kentucky State Police responding to the collision listed "water pooling" as an environmental factor of the accident.

Ives' widow, Kristina, on behalf of herself, her two minor children, and Ives' Estate, filed a wrongful death and negligence suit against Copley in Fayette Circuit Court. Kristina later amended her complaint to include claims against WSP, HMB and HDR – the Engineers that consulted on the design of the widened highway where the accident occurred. Thereafter, Copley filed a third-party complaint against the Engineers, effectively "joining forces" with Kristina (Appellees) for the sake of pursuing claims that the Engineers negligently designed the highway and that the defective design caused the accident.

Prior to the I-65 widening project, the portion of I-65 where the accident occurred was designed with the fast lane draining to the left-side grass median and the slow lane draining to the right shoulder and off the highway. Importantly, the highway as constructed by the Engineers' designs requires all water to travel across the left shoulder and all three travel lanes to exit on the right shoulder, thereby causing water to flow across all travel lanes. In the area leading up to the accident site, drainage inlets were placed at the bottom

6

of the concrete barrier wall where water from a portion of the highway and left shoulder drains into the inlets. The water collected by these inlets then travels underneath the concrete barrier wall, underneath the highway, and ultimately exits on the right side of the highway. Therefore, water collected by the inlets on this portion of I-65 does not travel over the lanes of the highway.

At the accident site, drainage inlets were omitted by the Engineers' design plan. There are no drainage inlets for the northbound lanes of I-65 beginning past the "point of curvature" (where the highway begins to curve and the pavement transitions, causing all the water to flow away from the barrier wall) to past the "point of tangency" (the point where the highway becomes straight again). Appellees' expert opined that if the Engineers followed more appropriate design standards, at least a portion of the left shoulder would have drained water away from through traffic, thus decreasing the risk of hydroplaning. Instead, due to a lack of drainage inlets, the Engineers' design resulted in more water flowing across the travel portions of the highway, thus creating an unduly hazardous roadway during expected rainfall, which was a substantial factor in the accident.

In his deposition, Andre Johannes, Project Manager for KYTC, specifically admitted that there is a chapter in the Kentucky highway design manuals regarding slope and water issues, but that he is not a drainage engineer and typically relies on the engineers hired for a project for drainage design. He continued to explain that he routinely relies on hired engineers to make sure the drainage and slope designs are correct.

Conversely, the Engineers assert that their plans, including all design exceptions, were accepted and approved by the KYTC and FHWA, and once approval was granted by the FHWA, neither the Engineers nor the KYTC had the ability to deviate from the final design plan. The accident occurred in a curved section of the interstate and HMB contends that there is a standard design for curved sections that drains all water from the inside barrier wall to the outside shoulder. That required design involves utilizing a straight-line slope from the median to the outside shoulder. HMB explained that once it was determined that a concrete barrier wall would be added to the highway, the Engineers were then locked in to utilizing the straight-line slope for the portion of the highway where the accident occurred. The final design plans for the widening project contained this standard straight-line slope – a design utilized in various sections of Kentucky's interstates according to HMB.

After discovery, the Engineers moved for summary judgment, arguing that (1) as contractors working for a governmental entity that is immune from liability, the Engineers were entitled to immunity; and (2) the claims asserted against the Engineers were preempted by federal law relating to the design of interstate highways that are part of the National Highway System. In opposition, the Appellees argued that the Engineers could be held liable for their negligence, and that their state tort claims were parallel to the applicable federal requirements and therefore were not preempted.

The Fayette Circuit Court granted summary judgment in favor of the Engineers, concluding they were immune from litigation. Further, all claims

8

asserted against them were preempted by federal law. Kristina and Copley appealed, and the Court of Appeals reversed and remanded. In a unanimous opinion, the Court of Appeals held that the mere fact the Engineers contracted with KYTC did not transform them into any kind of state actor for immunity purposes. Further, ultimate government approval of the Engineers' design plans could not absolve them from their own design negligence. The Court of Appeals also held that Kentucky's negligence and wrongful death actions were in harmony with federal law, and therefore the claims were not preempted.

## ANALYSIS

"The proper standard of review on appeal when a trial judge has granted a motion for summary judgment is whether the record, when examined in its entirety, shows there is 'no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Motorists Mut. Ins. Co. v. First Specialty Ins. Corp.,* 706 S.W.3d 120, 124 (Ky. 2024) (citation omitted). We review the grant of summary judgment de novo. *Caniff v. CSX Transp., Inc.,* 438 S.W.3d 368, 372 (Ky. 2014).

Here, we agree with the Court of Appeals that the trial court erred in granting summary judgment on immunity and preemption grounds. First, under long-standing Kentucky jurisprudence, the Engineers do not enjoy immunity simply because they served as contractors for a state agency. Second, the trial court likewise erred in granting summary judgment on grounds of "immunity" arising from the government's mandating of the design used by the Engineers because a genuine issue of material fact exists as to

9

whether that design was in fact governmentally "mandated." Finally, the trial court's finding that Appellees' claims are preempted by federal law was likewise in error.

**I.      The Engineers are not entitled to immunity simply because they contracted with a state agency.**

The trial court first found the Engineers are entitled to summary judgment because they are "immune" from the Appellees' claims. While the trial court's order did not distinguish between sovereign and related derivative immunities on the one hand, and the exemption from liability for contractors governmentally mandated to perform in the manner alleged to have been negligent on the other, it appears its decision was premised on both. In any event, we consider first the Engineers' contention that because they contracted with a state agency, they are entitled to enjoy the same sovereign or related derivative immunity the state agency itself would enjoy against a negligence claim.

Put simply, the Engineers argue that they are entitled to immunity in this case – immunity that is co-existent with the immunity held by the Commonwealth. We disagree. It is of course well-established that sovereign immunity protects the Commonwealth from suit. *Comair, Inc. v. Lexington-Fayette Urb. Cnty. Airport Corp.,* 295 S.W.3d 91, 94 (Ky. 2009). In fact—and with particular relevance to this case—Kentucky Revised Statute (KRS) 12.211 states that the state shall not "be subject to an action arising from discretionary acts or decisions pertaining to the design or construction of public highways, bridges, or buildings."

10

However, the fact that the state itself enjoys immunity from certain claims arising from the construction of public highways does not mean that contractors performing such work pursuant to contracts with the state also enjoy such immunity. To the contrary, nearly 100 years ago this Court's predecessor plainly overruled a line of cases holding that an independent contractor could not be liable in damages to injured third parties for negligence in prosecuting work performed under contract with the state. *Taylor v. Westerfield,* 233 Ky. 619, 26 S.W.2d 557, 561 (1930). Further, the Court held a state contractor is responsible for damages "just as he would be on private work." *Id.*

In *Combs v. Codell Construction Co.*, the high court again held that "immunity does not absolve the contractor from negligence in performing his contract" in a case requiring determination of whether a construction contractor was liable for damages caused by negligent construction. 244 Ky. 772, 52 S.W.2d 719, 720 (1932). Thereafter, this rule was reaffirmed by *Codell Construction Co. v. Steele,* in which a construction company asserted it was an agent of the state and therefore exempt from liability when a person was injured while traveling across one of its construction sites. 247 Ky. 173, 56 S.W.2d 955 (1933). The Court explained that the rule in *Taylor* completely determined that the construction company was subject to liability for its negligence. As a result, the jury was entitled to a negligence instruction. *Id.*

This tenet of Kentucky law was recently reaffirmed in *Shadrick v. Hopkins County, Ky.,* 805 F.3d 724, 729 (6th Cir. 2015). There, Butler entered

11

the Hopkins County Detention Center to serve a short sentence for a misdemeanor offense and died three days later from an untreated infection. Butler's mother filed suit alleging that Southern Health Partners, Inc. (SHP), a private for-profit corporation that contracted with Hopkins County to provide medical services to inmates, was negligent, among other claims. *Id.* The federal district court held that SHP was protected by qualified official immunity from the negligence claim. *Id.* at 744.

In determining whether SHP was entitled to share the county's governmental immunity, the Court of Appeals applied the test enunciated in *Comair:* "[t]he immunity inquiry turns on the source of the entity and 'the nature of the function it carries out.'" *Id.* at 745 (citing *Comair,* 295 S.W.3d at 99). The *Comair* Court explained that the origin of the entity matters because the entity's immunity status depends on whether the parent entity is immune. *Id.* The Sixth Circuit in *Shadrick* concluded that SHP did not satisfy the first part of the test because Hopkins County did not create SHP as a governmental agency, nor did it designate SHP as the county's agent. *Id.* at 746. SHP is a private, for-profit company and provides medical services to dozens of prison facilities in multiple jurisdictions. *Id.* Despite clearly satisfying the second prong of the test, and even though SHP contracted to perform a government function, it nonetheless could not partake in the county's immunity because it did not derive its existence and status from Hopkins County. *Id.*

Importantly, the *Comair* Court disclaimed any assertion that it was creating a bright-line rule for application of immunity and instead noted the

12

question of official immunity must be resolved on a case-by-case basis. 295 S.W.3d at 99. In any event, it is well-established under Kentucky law that one contracting with the state or a state agency does not enjoy immunity from a negligence claim simply because the state or agency itself would enjoy immunity. To the contrary, our highest court has long rejected the notion of any such immunity for contractors with the state. *See, e.g., Taylor*, 233 Ky. 619. Indeed, this long-held principle was recently affirmed in *Shadrick*, which likewise rejected the application of immunity to a private entity that had contracted with the government. 805 F.3d at 746.

Applying the *Shadrick* rationale to this case, the Engineers are not state agencies, but rather private, for-profit companies. Simply providing design services to the state does not automatically entitle the engineers to official immunity.[2] In fact, returning to *Taylor,* 233 Ky. 619, an independent contractor performing government services is liable for his own negligence and is "responsible just as he would be on private work."

While involving construction of a highway, not design, our high court has held that "[a] contractor constructing a highway without negligence under the plans of the Highway Commission is not liable for damages resulting from the obstruction of the stream on the right of way, **but he is liable for negligence in the performance of the contract** . . ." *H.H. Miller Constr. Co. v. Collins,* 269 Ky. 670, 108 S.W.2d 663, 664 (1937) (emphasis added). Likewise, this

---

[2] *See Sietsema v. Adams,* 2013-CA-001159-MR, 2015 WL 4776304, at *7 (Ky. App. Aug. 14, 2015), *reversed on other grounds by, Adams v. Sietsema,* 533 S.W.3d 172 (Ky. 2017).

13

Court's predecessor held that a construction company building highways could be "held responsible to appellee if the injury to him was caused by negligence." *Hunt-Forbes Constr. Co. v. Robinson,* 227 Ky. 138, 12 S.W.2d 303, 304 (1928). In *Hunt-Forbes,* the state contracted with a construction company to build a highway. *Id.* at 303. The construction required the highway cross through the plaintiff's land and, upon completion of the project, plaintiff's porch collapsed. *Id.* at 304. While the court recognized that when a contractor's performance is done "without negligence and within the terms of the contract," it cannot be liable for damages, it explicitly acknowledged that this general rule would not prevent a state contractor from being liable where a plaintiff's injury was caused by the contractor's negligence. *Id.*

While the case before us deals with the design, not construction, of a highway, the same principles are applicable. Just as a construction worker implementing designs approved by the Highway Commission is still liable in negligence for damages caused by faulty construction, engineers who propose designs can be liable in negligence for injuries caused by those designs, at least where the designs were not mandated by applicable guidelines. *See infra* Section II**.** Of course, as noted by the Court of Appeals, the KYTC's and FHWA's approval of the final designs as prepared and submitted by the Engineers may also be admitted to suggest the reasonableness of their conduct.

The Engineers rely on several cases that predate the court's holding in *Taylor* that a state contractor may be held liable just as he would be for private

14

work. 26 S.W.2d at 561. These cases primarily involve allegations against the city itself, not a contracting entity. *See Teager v. City of Flemingsburg,* 60 S.W. 718, 719 (Ky. 1901) (plaintiff sued city for alleged negligence in design of a sidewalk); *Clay City v. Abner,* 82 S.W. 276 (Ky. 1904) (involving alleged negligence on behalf of the city in the design of a street in which a pedestrian was injured); *McCourt v. City of Covington,* 143 Ky. 484, 136 S.W. 910, 911 (1911) (involving allegation that city should have adopted a different design relating to the covering of a catch basin). Further, *Portwood v. Hoskins-Squier,* 689 S.W.3d 728, 729 (Ky. App. 2024), is distinguishable because in that case, a pedestrian filed suit against the county government seeking to recover for injuries sustained when he was struck by a motorist while crossing the road. The plaintiff asserted that the government and its employees negligently failed to install pedestrian crosswalks. *Id.* Thus, the case involved suit against the government and its employees, not an independent government contractor.

Caselaw clearly indicates that an independent government contractor may nonetheless have to defend a negligence claim resulting from alleged deficient performance of its duties. As such, the trial court erred in holding the Engineers immune from suit simply because they contracted with a state agency.

II. **Summary judgment on grounds of "immunity" allegedly arising from the mandated nature of the Engineers' work was not appropriate because a genuine issue of material fact exists as to whether such work was in fact mandated.**

We next consider the Engineers' contention that the trial court correctly granted summary judgment because they cannot be held liable for work they

15

were mandated by the state to perform. While our case law recognizes such an exemption from liability, it was improperly applied here given the existence of genuine issues of material fact. Indeed, the Engineers' immunity argument is predicated on a disputed issue of material fact: whether the final design plans amount to state approval and mandating of the shoulder design defects alleged by Appellees.

Citing *Rigsby v. Brighton Engineering Co.,* 464 S.W.2d 279 (Ky. 1970), the Engineers claim they are immune because their design plans were approved—and thus mandated—by the KYTC and the FHWA and prepared in accordance with their design criteria, as established by AASHTO. In *Rigsby*, Brighton Engineering consulted the Kentucky Department of Highways in designing the Bluegrass Parkway. The Kusza family was traveling on the Parkway when their vehicle collided head-on with a bridge pier, killing all five family members. *Id.* Brighton designed bridge piers, which are vertical supports for bridges, and was sued by the family's estates for negligent design, among other claims. *Id.* at 280. The Estates specifically alleged that Brighton failed to recommend that a guardrail be constructed to prevent vehicles from colliding with the bridge pier. *Id.*

In an affidavit, the assistant project manager for the Kentucky Department of Highways stated that the design criteria did not require installation of guardrails around bridge piers, and that hired engineers are required to comply with standard design criteria. *Id.* "They have no discretion to alter, change or deviate therefrom in any material respect." *Id.* Despite

16

competing evidence from an expert engineer who opined that recommending guardrails at this location was reasonably necessary, the trial court granted Brighton's motion for summary judgment. *Id.* On appeal, the state's high court concluded that the Department of Highways adopted criteria that was binding on Brighton, and that a recommendation that guardrails be installed would have been futile. *Id.* at 281. Therefore, the Court held that Brighton could not be held liable for the alleged failure to recommend guardrails. *Id.*

Similarly, in *City of Louisville v. Padgett,* 457 S.W.2d 485, 486 (Ky. 1970), Padgett sued the city, a construction company, and Metropolitan Sewer District for injuries she sustained when a vehicle she was riding in hydroplaned and wrecked. Padgett claimed the parties were negligent in the construction and maintenance of the drainage system of the road where the incident occurred. *Id.* The Court held that "[o]rdinarily one contracting with the sovereign Commonwealth of Kentucky who performs his contract in conformity with the plans and specifications of the contract will not be held liable for injury to the public in the absence of a negligent . . . or a wilful [sic] tortious act . . . ." *Id.* at 488. Because the construction company was told what to do by highway department officials, the construction company could not be held liable. *Id.* at 490.

While unpublished, and clearly not binding, we also consider the Court of Appeals' decision in *McCarty v. Willett,* in which a young girl drowned after flood waters swept her car from a bridge in Monroe County. 2023 WL 7931118, at *1 (Ky. App. Nov. 17, 2023). McCarty, as administratrix of her

17

daughter's estate, filed suit against several parties, including the two engineering companies that helped design the bridge. *Id.* The trial court held that the engineering firms were protected by the county's sovereign immunity and by qualified official immunity. *Id.*

The appellate court first determined whether the engineers were an agent of the Commonwealth, pursuant to *Comair,* 295 S.W.3d at 99. The court reasoned that the status of the engineers was analogous to the status of SHP in *Shadrick* – the engineers were private, for-profit companies with numerous commercial clients. *McCarty* at *8. Therefore, the engineers were not entitled to immunity. *Id.* Additionally, the engineers argued that, in addition to being cloaked in the same immunity as the county, they were further entitled to immunity because the county approved its bridge design. *Id.* The Court of Appeals reasoned that the engineers' argument ignored the distinction between immunity and common law liability for negligence. *Id.*

The Court of Appeals declined to grant the engineers "derivative sovereign immunity" or "government contractor immunity." *Id.* at *9. Instead, the appellate court pointed to *Rigsby,* 464 S.W.2d at 281, for its straightforward application of a negligence analysis that does not extend sovereign or governmental immunity to the contractor. *Id.* Because issues of material fact existed, the court determined that summary judgment was inappropriate and remanded the case for further proceedings. *Id.* at *9, *11.

In this case, the Engineers argue that *Rigsby* mandates that they be held immune from liability for following the KYTC design requirements. They assert

18

that, like in *Rigsby,* the KYTC and FHWA approved the design and any attempt to deviate from that design would have been futile. Importantly, both the trial court and this Court's predecessor in *Rigsby* couched their analysis in terms of negligence, not immunity. In fact, the Court made no mention of immunity.

Further, in *Rigsby,* the plaintiffs were attempting to impose liability on consulting engineers for failing to adopt an alternative design that did not comply with Kentucky Department of Highways directives. Those plaintiffs alleged the engineers should have deviated from required standards. However, it was undisputed that the *Rigsby* engineers had no authority to deviate from the required standards. In this case, the Engineers were specifically hired to develop a highway design consistent and compliant with all federal and state standards. The Engineers' purported failure to comply with governing standards resulted in an allegedly negligent shoulder design, thus forming the basis for the Appellee's claims and potentially subjecting the Engineers to liability.

Moreover, in this case, the Appellees present evidence – admittedly controverted by the Engineers' competing evidence, but evidence all the same – that the government did **not** mandate the design of the highway, but rather simply required that certain guidelines be followed. That evidence could support a finding that the Engineers were not hired to implement plans that were already prepared, but rather for their design knowledge and expertise, and to exercise their independent judgment and knowledge of the AASHTO standards. Further, the Engineers were paid over four million dollars, surely

19

not to rubber-stamp generic or standard plans, but to make certain the design complied with AASHTO and the geographic landscape of the area.

The FHWA is responsible for assuring that the NHS is developed and maintained according to current approved design standards. Generally, the government has broad latitude concerning the design of public highways. *Sturgill v. Commonwealth, Dep't of Highways,* 384 S.W.2d 89, 91 (Ky. 1964). Because I-65 is part of the National Highway System, all construction and lane widening projects must comply with FHWA standards, in cooperation with KYTC standards, such as the *Highway Design Guidance Manual.*[3] The FHWA standards are those proffered by the American Association of State Highway and Transportation Officials (AASHTO). This book of standards is commonly referred to as the Green Book, and the FHWA has adopted this manual as their own through federal regulations that require AASHTO resources to be consulted on all projects within the NHS. Exceptions to these guiding standards are not allowed unless an approved design exception is granted by the FHWA. Ultimately, a final design plan for the widening project, called the Design Executive Summary, was prepared, and approved by both KYTC and the FHWA.

In this case, WSP contracted with KYTC as the prime design consultant and provided the overall roadway expansion design. In its contract with KYTC, WSP was paid $4,387,009, of which $4,200,856.05 was specifically designated

---

[3] Kentucky Transportation Cabinet, *Highway Design Guidance Manual* (Jan. 2006) https://transportation.ky.gov/Highway-Design/Highway%20Design%20Manual/General%20Information.pdf.

20

as "Roadway Design Lump Sum." WSP then contracted with HMB and HDR. HMB provided design plans for water flow and drainage, which WSP incorporated into the final design. As part of its contract with WSP, HMB agreed to secure professional liability insurance with limits of at least $1 million, and agreed to indemnify, defend, and hold harmless WSP and the KYTC from any claims arising out of its negligent acts or omissions. HDR had a limited role with the section of the project where the accident occurred and primarily designed schematics for maintenance of traffic for use during the construction project. WSP paid HMB $1,724,516 to provide "field surveys and engineering services." Importantly, all engineering entities involved in this project stamped the final design plans with their seals of approval.

If "FHWA's controlling criteria are not met on an NHS project, a design exception must be prepared." A design exception is defined by the FHWA as "a documented decision to design a highway element or a segment of highway to design criteria that do not meet minimum values or ranges established for that highway or project."[4] At the time of design, the FHWA delineated thirteen controlling criteria that require formal approval for design exceptions when criteria are not met: (1) design speed; (2) lane width; (3) shoulder width; (4) bridge width; (5) structural capacity; (6) horizontal alignment; (7) vertical alignment; (8) grade; (9) stopping sight distance; (10) cross slope; (11)

---

[4] Federal Highway Administration, *Mitigation Strategies for Design Exceptions* (July 2007) https://wsdot.wa.gov/publications/fulltext/ProjectDev/Manuals/MitigationManual.pdf.

21

superelevation; (12) vertical clearance; and (13) horizontal clearance. The only way to obtain exceptions to the minimum standards set forth in AASHTO is a design exception, which only the FHWA can grant pursuant to 23 Code of Federal Regulations (C.F.R.) § 625.3(f). Requested design exceptions are thoroughly analyzed and reviewed by a technical team. If a design exception is not obtained, the minimum standards set forth in AASHTO must be met. Here the experts agree that shoulder slope is not a controlling criterion for which a design exception can be requested.

As for state standards, the KYTC implemented the *Highway Design Guidance Manual* to provide uniformity in the interpretation and administration of laws, regulations, policies, and procedures applicable to highway design. The KYTC dictates the project from start to finish. Engineers are routinely hired by the KYTC to design road projects in the Commonwealth, including NHS projects, through a rigorous and competitive qualification process that includes selection by a committee consisting of professional engineers. For federal highway projects, the Kentucky Model Procurement Code requires KYTC to utilize this type of qualified-based selection process when procuring engineering design services for federal highway projects. The KYTC Design Manual explicitly adopts the AASHTO guidelines, requiring engineers to work within those parameters to propose plans and alternatives that meet minimum federal standards.

The *Highway Design Guidance Manual* specifically acknowledges that engineering judgment must be used in the design process:

22

This manual has been prepared to provide guidance to personnel of the Transportation Cabinet and primarily to the road designer. . . . This Highway Design Guidance Manual places an emphasis on flexibility. The goal is to be permissive by default and explicit where needed. Sufficient flexibility should encourage independent designs tailored to particular situations. **This manual should not supersede the application of sound engineering principles by experienced design professionals**.[5]

(Emphasis added).

Early in the design process, the FHWA, KYTC, and the Engineers determined that adding lanes to I-65 would be accomplished by replacing the existing grassy median that divided the two sides of the highway with a concrete median barrier wall. According to HMB, the FHWA and KYTC examined two proposed alternatives that did not involve replacement of the grassy median with a barrier wall, but those alternatives were ultimately rejected. HMB asserts that once the concrete median alternative was selected, it was then required to implement a design which required all water to drain from the concrete median barrier wall to the outside shoulder utilizing a straight-line slope that drains water to the outside shoulder, thus across all travel lanes.

Additionally, the Engineers notified KYTC of a preexisting issue with the accident scene – a sag vertical curve – that did not meet FHWA standards for minimum stopping sight distance. Because of this issue, along with six other sag vertical curves, the Engineers sought and obtained a design exception,

---

[5] Kentucky Transportation Cabinet, *Highway Design Guidance Manual* (Jan. 2006) https://transportation.ky.gov/Highway-Design/Highway%20Design%20Manual/General%20Information.pdf.

23

approved by the FHWA. The final design plans noted that the sag vertical curves were in a slight curvature section with low superelevation. Therefore, the plans asserted the drainage issues were of limited concern and were addressed in the design.

This exception was solely based on vertical alignment, which implicated only the reduction of the line of sight on the highway while traveling. This means the FHWA approved the stopping sight distance to be reduced from AASHTO's minimum standard of 730 feet to 652 feet at the area where this accident occurred, and in 6 other unrelated locations on I-65. No parties assert that the reduction of stopping sight distance contributed to the accident. Therefore, the contention that the design exception for vertical alignment resulted in FHWA approval for utilizing a straight-line shoulder slope with no rollover is misplaced, because the exception solely pertained to stopping sight distance. After the KYTC and FHWA approved the final design, a construction contractor added the new lanes, installed the concrete median barrier wall, and "superelevated" the curved sections of the roadway so that all lanes sloped in one direction, pursuant to the Engineers' design.

Returning to the applicable summary judgment standard, genuine issues of material fact exist as to the appropriateness of the Engineers' design, including whether it satisfies the governing standards, whether an exception should have been obtained, or whether the exception obtained sufficiently addressed the purported issues at the scene of the accident. Appellees' expert, James Valenta, is a highway safety engineer with over 47 years of experience in

24

traffic safety research and highway design. In his opinion, the failure to include appropriate drainage inlets and slope a portion of the highway so that water drained into the drainage inlets, and not across the entire shoulder and travel lanes, failed to meet the minimum standards required by the KYTC and the FHWA. According to Valenta, the required design standards of the KYTC and FHWA call for at least a portion of the shoulder area to be drained away from the through traffic lanes. Therefore, he opined that the Engineers did not follow this design requirement, thus creating an unduly hazardous roadway during rainfall events, which was a substantial factor causing the accident.

Additionally, Valenta consulted Brent Slone, another engineering expert, who provided accident reconstruction services and performed an analysis of the accident data at the crash site both before and after construction. Slone calculated that the construction resulted in an increase in wet pavement accidents of 466% and was a result of designing stormwater runoff to drain across the through lanes of traffic. Slone noted that from May 16, 2011, to September 16, 2014, six wet pavement accidents occurred in the area, averaging 1.8 accidents per year. This period was prior to or during the design of the widened highway. After the designs were implemented and the highway was reconstructed, between July 31, 2017, and November 20, 2020, 34 wet pavement accidents were reported, which averages 10.2 accidents per year. Slone appropriately adjusted his calculations to account for an increase in road traffic and increase in precipitation days. Notably, two "slippery when wet" signs have been added to the accident site since this accident occurred.

25

The AASHTO standards state that in areas with a depressed median, all shoulders should be sloped to drain away from the traveled way on a divided highway. A depressed median, like the median that existed prior to the highway widening in this case, is lower than the road and is utilized for superior drainage and preventing head-on collisions given the wide separation between the directions of the interstate.[6] Conversely, a raised narrow median involves a concrete barrier elevated above the road, which prevents crossover collisions.[7] This type of median was added through the widening project.

> "With a raised narrow median, the median shoulders may slope in the same direction as the traveled way. However, in regions with snowfall, median shoulders should be sloped to drain away from the traveled way to avoid melting snow draining across travel lanes and refreezing. **All shoulders should be sloped sufficiently to rapidly drain surface water,** but not to the extent that vehicular use would be restricted."[8]

(Emphasis added).

Using images from the final design plans, Valenta points out that a straight-line slope was recommended at the accident site, draining water from the concrete median barrier to the right-side shoulder. He notes that there is no shoulder break as required by the KYTC *Highway Design Guidance Manual*,

---

[6] Georgia Department of Transportation, *Improving Safety and Reducing Costs* (last visited Feb. 27, 2026) https://www.dot.ga.gov/GDOT/pages/Medians.aspx#:~:text=Medians%20are%20porti ons%20of%20the%20roadway%20that,/suburban%20areas%20*%20Increase%20cap acity%20by%2030%25.

[7] *Id.*

[8] *A Policy on Geometric Design of Highways and Streets,* AASHTO, "Shoulder Cross Sections," § 4.4.3.

26

and that the full shoulder drains across the travel lanes which is not recommended by the National Highway System design standards. In his deposition, he explained that it was a mistake for the Engineers to incorporate the typical section for a superelevated portion of the roadway that featured a straight-line slope from the concrete median all the way across the highway. Superelevation relates to the amount of cross slope needed on a horizontal curve to help counterbalance the centrifugal force of a vehicle traveling the curve based on the design speed.[9] Valenta asserted that the highest point should have been the line between the 14-foot shoulder and the new widened lane.

> Valenta explained the perceived slope issue as follows:
>
> Defendant engineers incorrectly designed the highway with a 2.8% straight line slope from the concrete median barrier across the 14 foot left shoulder where the barrier wall begins and the 2.8% slope continues across three (3) lanes of travel and exits after traveling over the right shoulder. By the defendant engineers improperly designing the highway where the accident occurred, there is extra stormwater from the 14 foot shoulder, together with an additional travel lane of pavement (as compared to pre-construction) which has placed more stormwater on the highway causing hydroplaning of vehicles.

Instead, Valenta opined that there should have been a slope to drain water from the left shoulder to the barrier wall and then into a drain, meaning the design should have included the highest point to be the line between the fourteen-foot shoulder and the new widened lane. That high point would have

---

[9] *Design Exceptions,* Texas Department of Transportation (last visited Feb. 27, 2026) https://www.txdot.gov/content/txdotoms/us/en/manuals/des/rdw/chapter-1--general-guidance/1-2-design-exceptions--design-waivers--design-vari/1-2-1-design-exceptions.htm.

created a slope to the left, thus draining water off the left shoulder, instead of sloping to the right as shown in the Design Executive Summary. In sum, Valenta opined that the design standards of the KYTC and the FHWA call for at least a portion of the shoulder area to be drained away from the through traffic lanes, and this design requirement was not followed by the Engineers.

On the other hand, HMB contends the 2.8% straight line slope design was compliant with the AASHTO standards. Andre Johannes, Project Manager for KYTC, testified in his deposition that the Engineers complied with both KYTC and AASHTO standards with respect to the design where the accident occurred. He further stated the area in which the accident occurred was a curve, so "[f]or drainage purposes, this results in super-elevation rather than a crown point."[10] The Engineers explain his opinion to mean that because the area was a curve, the Engineers were required to utilize a straight-line slope and could not deviate from that requirement by adding a crown point. To the extent the Engineers or their experts disagree with Valenta, this is a question of fact with respect to how the Engineers designed the highway and whether such designs met the applicable standard of care.

Based on the foregoing, summary judgment was improper. Whether the Engineers complied with the applicable standards is clearly contested. The

---

[10] We acknowledge that in *Rigsby*, exemption from liability was found where the plaintiff presented only evidence that the particular design feature at issue was "necessary" but did not contradict the defendant's showing that the state forbade such a feature. Here, in contrast, Appellees meet the Engineers' proof that the state would not have allowed the desired design feature with competing expert proof that such a feature in fact was allowable.

28

parties submitted evidence demonstrating that there are genuine issues of material fact, thus precluding summary judgment.

### III.     The Appellees' claims are not federally preempted.

The trial court also found summary judgment warranted on grounds that Appellees' claims are federally preempted. Again, we disagree. There is no evidence presented in this case that Kentucky law requires a higher standard for this roadway design issue than the FHWA.

The Engineers argue that because the FHWA has complete and exclusive control over the design of interstate highways that are part of the NHS, Appellees' negligence claims are preempted by federal law. Federal preemption, derived from the supremacy clause of the United States Constitution, directs that a state law that conflicts with federal law is without effect. *Niehoff v. Surgidev Corp.,* 950 S.W.2d 816, 820 (Ky. 1997). Preemption can be express, when the preemption language is found in the explicit language of federal law, *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504 (1992), or implied. "Implied preemption occurs when the state law actually conflicts with federal law or where the federal law so thoroughly occupies the legislative field that it may be reasonably inferred that Congress left no room for the state to supplement it." *Niehoff,* 950 S.W.2d at 820.

Congress has charged the FHWA with overseeing the design, construction, and maintenance of the NHS. *See* 49 United States Code (U.S.C.) § 104, 23 U.S.C. § 315. The applicable standards for interstate design are expressly set forth in 23 C.F.R. § 625. The purpose in adopting federal

29

guidelines for interstate design is to "[a]dequately serve the existing and planned future traffic of the highway in a manner that is conducive to safety, durability, and economy of maintenance . . . ." 23 C.F.R. § 625.2(a)(1). An explicit goal of the FHWA is to provide the highest practical and feasible level of safety for people traveling on the NHS and to reduce hazards and "the resulting number and severity of accidents." 23 C.F.R. § 625.2(c). Further, the regulations specify the design standards to be utilized, but the standards are not absolute, and exceptions are permitted so long as the appropriate approval is received. 23 C.F.R. § 625.3(f)(1).

The Engineers assert that they designed the particular section of I-65 where the accident occurred in accordance with FHWA and KYTC requirements, therefore following the correct procedure as mandated by 23 C.F.R. § 625. Neither the enabling statutes nor the regulations contain an express statement of preemption, thus directing our analysis to implied preemption.

The Supreme Court has explained that it addresses claims of preemption "with the starting presumption that Congress does not intend to supplant state law." *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 654 (1995). The Engineers assert that federal regulations would have no significance if a jury were simply allowed to second-guess the FHWA's approval of a design and determine at some time later that the FHWA made a mistake. The Engineers' position that state law negligence claims in Kentucky

30

cannot coexist with federal highway design standards is simply unsupported by the law.

In *Russell v. Johnson & Johnson, Inc.,* 610 S.W.3d 233, 238 (Ky. 2020), a patient and his wife filed state law tort claims against a medical device manufacturer after a catheter perforated the patient's pulmonary vein, causing life-threatening issues. The federal Medical Device Amendments (MDA), applicable to the patient's claims, contains a limited preemption clause preempting states from establishing requirements for medical devices that are different from or in addition to any requirement applicable to the device under federal law. *Id.* at 238-39.

Citing several federal cases, the Court made clear that "limited federal preemption only applies to the extent Kentucky's parallel tort claims seek to impose a higher standard than federal law; our claims must be in harmony with federal regulations." *Id.* at 240. The Court held that "[i]f a state tort standard imposes a higher duty than federal regulations, the state standard is only preempted to the extent it imposes a more stringent duty . . . ." *Id.* "[A]s long as the state cause of action seeks to vindicate a claim within the boundaries of the federal regulation, it survives." *Id.*

The Engineers emphasize that federal law requires the Engineers to comply with standards when designing a national highway and those standards were satisfied. Further, they assert that Appellees' claims that the design should have been different from the design required by federal standards conflicts with the federal requirements.

31

In *CSX Transportation, Inc. v. Easterwood,* 507 U.S. 658, 661 (1993), a man was killed when a train operated by CSX collided with his truck at a railroad crossing. His widow pursued a wrongful death action, alleging CSX was negligent under Georgia law for failure to maintain adequate warning devices at the crossing and operating the train at an excessive speed. *Id.* The Court was tasked with determining the extent to which the Federal Railroad Safety Act (FRSA) preempted the state law claims. *Id.* The FRSA permits states to adopt laws or regulations relating to roadway safety "until such time as the Secretary has adopted . . . a regulation . . . covering the subject matter of such State requirement." *Id.* at 662. Thus, the Court explained that to prevail on the preemption claim, the petitioner had to establish more than that the regulations "touch upon" or "relate to" the maintenance and operation of trains at crossings. *Id.* at 664. The Court reasoned that "covering" indicated that preemption **"will lie only if the federal regulations substantially subsume the subject matter of the relevant state law."** *Id.*

The FHWA dictates that states must employ warning devices that comply with its Manual on Uniform Traffic Control Devices for Streets and Highways (MUTCD), and regulations specify that warning devices must be installed at grade crossings. *Id.* at 666. As part of its ultimate holding that the state law negligence claims were not preempted, the Court held that the requirement that states comply with the MUTCD "does not cover the subject matter of the tort law of grade crossings." *Id.* at 668. In so reasoning, the Court explicitly recognized that the MUTCD states: "[i]t is the intent that the provisions of this

32

Manual be standards for traffic control devices installation, but not a legal requirement for installation." *Id.* at 669. The enactment of the regulatory scheme for grade crossings did not rewrite traditional negligence law. *Id.* at 668. Therefore, the negligence claims regarding the grade crossing design were not preempted. *Id.* at 676.

Likewise, in this case, the FHWA requires that the design of highways part of the NHS, like I-65, comply with certain requirements. The parties agree that the highway design had to comply with *A Policy on Geometric Design of Highways and Streets,* published by AASHTO and commonly referred to as the "Green Book." The Green Book explicitly states:

> [t]he intent of this policy is to provide guidance to the designer by referencing a recommended range of values for critical dimensions. Good highway design involves balancing safety, mobility, and preservation of scenic, aesthetic, historic, cultural, and environmental resources. **This policy is therefore not intended to be a detailed design manual that could supersede the need for the application of sound principles by the knowledgeable design professional. Sufficient flexibility is permitted to encourage independent designs tailored to particular situations**.[11]

(Emphasis added). One of HMB's experts, Taylor Kelly, opined that the AASHTO standards are only a "guidance manual" used as a tool to inform decisions.

The Engineers argue that adoption of these federal standards preempt state tort law claims trying to impose different standards in the design of interstate highways. To the contrary, the state tort law claim – that the design defects at issue did not comply with the applicable FHWA standards – seek to

---

[11] 6th ed., p. xli (2011).

33

impose the same standards as federal law requires. While the federal government has clearly opted to regulate highway construction and design through imposition of the AASHTO standards, we fail to see how the negligence claims conflict with federal law.

Here, state law does not conflict with federal law. There is no conflict between the federal regulations governing highway design and requiring professional engineers, who were paid considerable sums for their design expertise, to exercise ordinary care under general principles of negligence.

## CONCLUSION

For the foregoing reasons, we affirm the Court of Appeals.

All sitting. Lambert, C.J.; Conley, Goodwine, and Keller, JJ., concur. Nickell, J., dissents by separate opinion which Thompson, J., joins.

NICKELL, J., DISSENTING: Respectfully, I dissent. In my view, the Engineers were entitled to summary judgment based on the governmental contractor defense. Therefore, I would reverse the decision of the Court of Appeals and reinstate the judgment of the trial court.

Kentucky law has long recognized a form of the governmental contractor defense which our predecessor Court formulated as follows:

> Ordinarily, one contracting with the sovereign Commonwealth of Kentucky who performs his contract in conformity with the plans and specifications of the contract will not be held liable for injury to the public in the absence of a negligent or a wilful tortious act or he is engaged in an ultra-hazardous activity such as blasting, which is treated as trespass.

*City of Louisville v. Padgett*, 457 S.W.2d 485, 488 (Ky. 1970).

34

Under *Padgett,* a governmental contractor "is not chargeable with negligence" when the work is performed in strict "conformity with the . . . specifications of the Department of Highways." *Id.* Similarly, in *Rigsby v. Brighton Engineering Co.,* 464 S.W.2d 279, 280-81 (Ky. 1970), our predecessor Court held an engineering consultant was not negligent in failing to recommend the placement of guardrails around a bridge pier because it had followed the design criteria and standards mandated by the Department of Highways and it had "no discretion to alter, change or deviate therefrom[.]"

In Kentucky, the governmental contractor defense is based on principles of derivative sovereign immunity. *Hunt-Forbes Constr. Co. v. Robinson,* 12 S.W.2d 303, 304 (Ky. 1928). Our predecessor Court explained:

> The state is the sovereign and is not suable without its consent. It has not given its consent. Therefore the state could not be sued by appellee for the damages, if any, caused him by the construction of this road. It is contended, therefore, that appellant could not be held responsible for any damages occasioned in the performance of the contract made with the state if that performance was without negligence and within the terms of the contract. That seems to be the general rule in this state.

*Id.*

By comparison, in the federal context, the governmental contractor defense is an affirmative defense based on principles of preemption which is legally and conceptually distinct from the defense of derivative sovereign immunity.[12] *Al Shimari v. CACI Int'l., Inc.,* 679 F.3d 205, 218 (4th Cir. 2012).

---

[12] An affirmative defense generally "operates in confession and avoidance, meaning that even assuming the plaintiffs['] allegations to be true, he is nonetheless not entitled to recover." *St. Joseph Catholic Orphan Soc'y v. Edwards,* 449 S.W.3d 727, 737 (Ky. 2014). By contrast, immunity relieves a defendant from the costs and

The preemption rationale "aim[s] at protecting governmental policy decision-making against collateral attack in the courts in products liability litigation." 63A Am. Jur. 2d *Products Liability* § 1272 (2026).  I perceive the policy considerations underlying the preemptive component of the federal rule to be consistent with both Kentucky caselaw on the governmental contractor defense and public policy as articulated in KRS 177.240 which provides that design approval by a highway authority "shall be final[.]"

In my estimation, *Rigsby* is controlling here and cannot be meaningfully distinguished from the present appeal.  The standards and criteria for the widening and reconstruction of an interstate highway are mandated by federal law and any such design plans are subject to the approval of the Federal Highway Administration in cooperation with the various state departments of transportation.  *See* 23 U.S.C. § 315; 49 U.S.C. § 104; 23 C.F.R. § 625.1; § 625.3; § 625.4.

Moreover, in the present appeal, the entire highway project, including the work of the Engineers, was subject to the evaluation, supervision, and final decision-making authority of the Transportation Cabinet.  Kentucky Transportation Cabinet, *Highway Design Guidance Manual* (March 2017), at § HD-203.1; HD-205.7.[13]  The Transportation Cabinet is authorized to make key decisions throughout the project including the determination of the project's

---

burdens of litigation, including discovery, in addition to protection from liability. *Rowan Cnty. v. Sloas,* 201 S.W.3d 469, 474 (Ky. 2006).

[13] Available at:  https://transportation.ky.gov/Organizational-Resources/Policy%20Manuals%20Library/Highway%20Design.pdf

purpose and need; consideration of the range of alternative designs; and the selection of a preferred alternative. *Id.*, at § HD-203.2. Once the Transportation Cabinet approved the selection of its preferred alternative design, which was approved, in turn, by the Highway Administration, the Engineers had no discretion to deviate from the Transportation Cabinet's chosen design. In other words, the criteria adopted by the Highway Administration and Transportation Cabinet were binding on the Engineers. *Rigsby*, 464 S.W.2d at 281.

On the present record, there is no genuine dispute of material fact pertaining to whether the Engineers' design complied with the federally mandated standards and criteria for the widening and reconstruction of the interstate. In addition, there is no genuine dispute of material fact relative to whether the proposed design was approved by the Highway Administration and Transportation Cabinet in accordance with the applicable procedures dictated by federal and state law. Thus, under *Rigsby*, the Engineers cannot be held liable for negligence because the mandated design specifications were followed. 464 S.W.2d at 281. Mere disagreement with a government approved and legally compliant highway design is not sufficient to send a claim of negligence to the jury. *Id.*

The governmental contractor defense, as firmly established under both federal and Kentucky law, operates "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A.*

37

*Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984). Based on the foregoing, I would reject the imposition of any additional legal duty upon a governmental contractor where the approved design work is indisputably compliant with binding federal and state design mandates.

To hold otherwise would undermine the final and exclusive authority of the Highway Administration and Transportation Cabinet to determine and approve the appropriate design for highway projects. Stated differently, the imposition of tort liability upon a governmental contractor for a compliant and approved highway design based on post-hoc third-party opinion is tantamount to an impermissible collateral attack on the highway authorities' ability to regulate and set policy. The resultant infringement on discretionary governmental functions and the danger of inconsistent verdicts is manifest. I am convinced *Rigsby* controls here to prevent such an outcome. Therefore, I respectfully dissent and would reinstate the judgment of the trial court.

Thompson, J., joins.

COUNSEL FOR HMB PROFESSIONAL ENGINEERS, INC.; D. PAUL LINCKS; AND HAWORTH-MEYER-BOLEYN PROFESSIONAL ENGINEERS, INC.:

John D. Clay, Jr.
Denise Michelle Motta
Gordon Rees Scully Mansukhani LLP

COUNSEL FOR HDR ENGINEERING, INC. AND JAMES L. GUINN:

John Wickliffe Hays
Mary Lancaster Bryson
Kenneth Bradley Oakley
Jackson Kelly PLLC

COUNSEL FOR WSP USA INC.; PARSONS BRINCKERHOFF, INC.; AND SUSAN ROWLAND SLADE, AS PERSONAL REPRESENTATIVE AND EXECUTRIX OF THE ESTATE OF FRANK STEVEN SLADE:

Bethany A. Breetz
William G. Geisen
Michael D. Risley
Cassandra L. Welch
Megan K. George
Stites & Harbison PLLC

COUNSEL FOR KRISTINA L. IVES, INDIVIDUALLY; KRISTINA L. IVES, AS THE NEXT FRIEND FOR THE MINOR CHILDREN, HIRAM MILLER IVES AND JUNE LELIA IVES; AND KRISTINA L. IVES, AS THE PERSONAL REPRESENTATIVE AND ADMINISTRATRIX OF THE ESTATE OF HIRAM DUDLEY IVES, III:

Benjamin Kessinger, III
Mason Moore Kessinger
Kessinger Law Group, PLLC

COUNSEL FOR JENNINGS L. COPLEY AND NECTO ARCHITECTURE, PSC:

Bartley K. Hagerman
Erik D. Peterson
Mehr Fairbanks Trial Lawyers, PLLC

COUNSEL FOR AMICUS CURIAE, AMERICAN COUNCIL OF ENGINEERING COMPANIES OF KENTUCKY:

Mitchel T. Denham
McBrayer PLLC